297 Ga. 1
FINAL COPY

S14A1874. COTTRELL et al. v. ATLANTA DEVELOPMENT
AUTHORITY et al.

MELTON, Justice.

This case concerns the Superior Court of Fulton County's validation of roughly $200 million in municipal bonds (the "2014 NSP Bonds") to be issued by the Atlanta Development Authority d/b/a Invest Atlanta ("Invest Atlanta"). Invest Atlanta and the Geo. L. Smith II Georgia World Congress Center Authority ("Congress Center Authority") (collectively, the "New Stadium Entities") propose to have the 2014 NSP Bonds issued for the purpose of funding a portion of the cost of developing, constructing, and operating a new stadium facility in downtown Atlanta (the "New Stadium Project" or "NSP") for the Atlanta Falcons professional football team. Additional funding for the NSP will be provided by the Atlanta Falcons Stadium Company, LLC ("StadCo"), a Georgia limited liability company associated with the Atlanta Falcons Football Club, LLC (the "Club"), as well as through the sale of personal seat licenses. The NSP is a successor facility to the over twenty-year-old Georgia Dome, and

it will be owned by the Congress Center Authority, which also owns the Georgia Dome.

Procedurally, on February 4, 2014, the State of Georgia filed a Petition for Bond Validation in the superior court to authorize the issuance of the 2014 NSP Bonds. A notice to the public was filed on that same day, as well as a Rule Nisi Order setting the bond validation hearing for February 17, 2014. Notice of the proceeding was published in the Fulton County Daily Report on February 7, 2014 and February 14, 2014 as required by OCGA § 36-82-76. Rev. William L. Cottrell, Sr., Mamie Lee Moore, Tracy Y. Bates, John H. Lewis, III, and Joe Henry Beasley (hereinafter collectively "Cottrell") moved to intervene in the proceedings to file objections to the bond validation, and the trial court allowed them to do so. Among other things, Cottrell contended that OCGA § 48-13-51 (a) (5) (B), which allows for an extended time period in which a county or municipality may levy a Hotel/Motel tax for purposes of funding a "successor facility" to an existing "multipurpose domed stadium facility," was an unconstitutional special law. See Ga. Const. of 1983, Art. III, Sec. VI, Par. IV (a). The bond hearing was continued until April 10, 2014, and the trial court entered a Consolidated Pre-Trial Order on April 8, 2014. Following the April

10, 2014 hearing, the trial court entered a May 8, 2014 Validation Order and

Final Judgment validating the 2014 NSP Bonds and overruling all objections.

Cottrell appeals from this ruling, and, for the reasons that follow, we affirm.

By way of background, the Georgia Dome was, and the NSP is to be,

funded in part by a Hotel/Motel tax levied under OCGA § 48-13-51 (a) (5).[1]

Generally, Hotel/Motel taxes can only be levied at a rate of three percent or less.

---

[1] The statute states in relevant part that

> (i) . . . a county (within the territorial limits of the special district located within the county) or municipality is authorized to levy a tax under this Code section at a rate of 7 percent. A county or municipality levying a tax pursuant to this paragraph shall expend an amount equal to at least 51.4 percent of the total taxes collected prior to July 1, 1990, at the rate of 7 percent and an amount equal to at least 32.14 percent of the total taxes collected on or after July 1, 1990, at the rate of 7 percent for the purpose of [among other things]: (I) promoting tourism, conventions, and trade shows[.] . . .
>
> (ii) In addition to the amounts required to be expended under division (i) of this subparagraph, a county or municipality levying a tax pursuant to this paragraph shall further expend (in each fiscal year during which the tax is collected under this paragraph) an amount equal to 14.3 percent of the total taxes collected prior to July 1, 1990, at the rate of 7 percent and an amount equal to 39.3 percent of the total taxes collected on or after July 1, 1990, at the rate of 7 percent toward funding a multipurpose domed stadium facility. . . . Any tax levied pursuant to this paragraph shall terminate not later than December 31, 2020[.] . . .

OCGA § 48-13-51 (a) (5) (A) (i) and (ii).

See OCGA § 48-13-51 (a) (1) (D) ("Except as provided in paragraphs (2.1), (2.2), (3), (3.1), (3.2), (3.3), (3.4), (3.5), (3.7), (4), (4.1), (4.2), (4.3), (4.4), (4.5), (4.6), (4.7), (5), (5.1), (5.2), and (5.3) of this subsection, no tax levied pursuant to this Code section shall be levied or collected at a rate exceeding 3 percent of the charge to the public for the furnishings."). However, OCGA § 48-13-51 (a) (5) (A) provides an exception to this three percent ceiling for Hotel/Motel taxes by allowing counties and municipalities to levy a seven percent Hotel/Motel tax as long as a designated portion of the collected tax proceeds is used to fund a multipurpose domed stadium facility. Before 2010, taxes imposed under Paragraph (a) (5) of OCGA § 48-13-51 were required to have a stated expiration date "not later than December 31, 2020." OCGA § 48-13-51 (a) (5) (A) (ii). However, the General Assembly amended Paragraph (a) (5) in 2010 to add a new subsection (B), which allowed those taxing jurisdictions that had previously levied a tax under Paragraph (a) (5) to extend the stated expiration date to December 31, 2050, so long as the same portion of the proceeds that had been used to fund the original multipurpose domed facility was expended to fund a "successor facility" during the extended period. Pursuant to OCGA § 48-13-51 (a) (5) (B):

4

Notwithstanding the [December 31, 2020] termination date stated in division (ii) of subparagraph (A) of this paragraph . . . a tax levied under this paragraph may be extended by resolution of the levying county or municipality and continue to be collected through December 31, 2050, if a state authority certifies: (i) that the same portion of the proceeds will be used to fund a successor facility to the multipurpose domed facility as is currently required to fund the multipurpose domed facility under division (ii) of subparagraph (A) of this paragraph; (ii) that such successor facility will be located on property owned by the state authority; and (iii) that the state authority has entered into a contract with a national football league team for use of the successor facility by the national football league team through the end of the new extended period of the tax collection.

In order to structure the deal and issue the 2014 NSP Bonds for the New Stadium Project, the New Stadium Entities created various agreements and took several steps:

● Based on the 2010 subsection (B) amendment to OCGA § 48-13-51 (a) (5) allowing for an extended period to collect a Hotel/Motel tax as long as a certain percentage of the proceeds collected during the extended period were expended to fund a "successor facility," in March 2013, the City passed City Resolution 13-R-0615, which authorized

the Mayor to execute (1) a Hotel/Motel Tax Funding

5

Agreement with [Invest Atlanta], as consideration for Invest Atlanta agreeing to provide for the development, construction, equipping, and funding of the publicly financed portion of the cost of a multi-purpose operable roof stadium through its issuance of revenue bonds necessary to provide such services and facilities and the [City] agreeing to make payments from certain Hotel/Motel Taxes collected under such agreement to be pledged as security for the [2014 NSP Bonds] (2) a Hotel/Motel Tax Operation and Maintenance Agreement ["O&M Agreement"] with [the] Congress Center Authority for the use of funds in excess of the amount necessary for payments due under the Hotel/Motel Tax Funding Agreement to provide for operation and maintenance services for the new stadium, all in accordance with OCGA [§] 48-13-51 (a) (5) [(B)]; and for other purposes.

The City prepared a Hotel/Motel Tax Funding Agreement with Invest Atlanta and an O&M Agreement with the Congress Center Authority consistent with City Resolution 13-R-0615. The City currently levies a Hotel/Motel Tax, and 39.3 percent of the first seven percent of the tax will be paid to fund the NSP (the "NSP Tax Proceeds").

● Invest Atlanta is to issue the 2014 NSP Bonds, which Bonds will be secured by Invest Atlanta's pledge and assignment of the NSP Tax Proceeds to a bond Trustee. The City will collect the tax and

transfer the proceeds to Invest Atlanta, and Invest Atlanta will use the NSP Tax Proceeds to pay the debt service on the 2014 NSP Bonds.

● Pursuant to a "Bond Proceeds Funding and Development Agreement," Invest Atlanta is to place the proceeds from the sale of the 2014 NSP Bonds into a Project Fund and instruct the Trustee to distribute money from the Project Fund to the Congress Center Authority. The Congress Center Authority will use the money to fund the New Stadium Project, and the Congress Center Authority will own the New Stadium Project. The Congress Center Authority will also raise money to fund a portion of the NSP by selling certain personal seat licenses. StadCo will provide all additional funds necessary for the NSP.

● After paying the necessary NSP Tax Proceeds to Invest Atlanta to provide for the payment of the principal and interest on the 2014 NSP Bonds, the City will allocate the remaining NSP Tax Proceeds

to the Congress Center Authority, consistent with the extended levy provision of OCGA § 48-13-51 (a) (5) (B). The Congress Center Authority, in turn, will use those proceeds to pay a portion of the NSP's future capital upkeep, maintenance and operating expenses.

● StadCo and the Club are required to play Atlanta Falcons' regular-season and post-season home games at the New Stadium Project for at least 30 years.

1. Cottrell contends that the 2010 subsection (B) amendment to OCGA § 48-13-51 (a) (5) is an unconstitutional "special law" that violates the Uniformity Clause of the Georgia Constitution. See Ga. Const. of 1983, Art. III, Sec. VI, Par. IV (a). We disagree.

Pursuant to the Uniformity Clause, "[l]aws of a general nature shall have uniform operation throughout this state and no local or special law shall be enacted in any case for which provision has been made by an existing general law. . . ." Id. In this regard, a statute would run afoul of the Constitution if it were "a general law which lack[ed] uniform operation throughout the state or

8

a special law for which provision ha[d] been made by existing general law."

Lasseter v. Ga. Public Svc. Comm., 253 Ga. 227, 229 (2) (319 SE2d 824) (1984). However,

> "[o]ur State Constitution only requires a law to have uniform operation; and that means that it shall apply to all persons, matters, or things which it is intended to affect. If it operates alike on all who come within the scope of its provisions, constitutional uniformity is secured. *Uniformity does not mean universality*. This constitutional provision is complied with when the law operates uniformly upon all persons who are brought within the relations and circumstances provided by it.'" [Cits.] *A law which operates uniformly upon all persons of a designated class is a general law within the meaning of the Constitution, provided that the classification thus made is not arbitrary or unreasonable*. [Cit.]

(Emphasis supplied.) State v. Martin, 266 Ga. 244, 246 (4) (466 SE2d 216) (1996). Indeed, the General Assembly may properly exclude certain persons or things from the application of a general law. McAllister v. American National Red Cross, 240 Ga. 246 (2) (240 SE2d 247) (1977). As explained more fully below, OCGA § 48-13-51 (a) (5) (B) is a proper exception to the general law of OCGA § 48-13-51 (a) (1) (D), which imposes a three percent cap on Hotel/Motel taxes, in that the statute applies uniformly on all taxing authorities which come within the scope of its provisions, and because the classification made by the statute is not arbitrary or unreasonable.

9

As an initial matter, this Court has previously determined that OCGA § 48-13-51 (a) (5) (A), the statute most closely related to OCGA § 48-13-51 (a) (5) (B), is a proper general law. See Youngblood v. State, 259 Ga. 864, 866 (2) (388 SE2d 671) (1990) (upholding constitutionality of OCGA § 48-13-51 (a) (5) (A) under the similar Tax Uniformity Clause). In this connection, OCGA § 48-13-51 (a) (5) (A) provides a proper general law exception to OCGA § 48-13-51 (a) (1). More specifically, as mentioned previously, OCGA § 48-13-51 (a) (1) allows for the levy of a Hotel/Motel tax that may not "exceed[ ] 3 percent." OCGA § 48-13-51 (a) (1) (D). There are several exceptions to this three percent cap on Hotel/Motel taxes, one of which, OCGA § 48-13-51 (a) (5) (A), allows for the levy of a seven percent Hotel/Motel tax for purposes of funding a multipurpose domed stadium facility through December 31, 2020. See OCGA § 48-13-51 (a) (5) (A) (ii). This exception to the three percent cap on Hotel/Motel taxes is proper, in that it applies uniformly to any "county (within the territorial limits of the special district located within the county) or municipality" (OCGA § 48-13-51 (a) (5) (A) (i)) that has decided to levy such an increased tax, and in that it is reasonable, because allowing this class of taxing entities to collect an increased tax on "the provision of public

10

accommodations. . . is not arbitrary[,] as the[ ] businesses [subject to the tax] will directly benefit from an increase in tourism and the provision of local government services within the district" in which the multipurpose domed stadium facility is being built. Youngblood, supra, 259 Ga. at 866 (2).

Like subsection (A) before it, OCGA § 48-13-51 (a) (5) (B) is also a constitutional general law exception to the three percent cap on Hotel/Motel taxes contained in OCGA § 48-13-51 (a) (1). It is of no consequence that subsection (B) happens to only impact the New Stadium Project at this time, as the other counties and municipalities covered under subsection (A) that could have collected a seven percent Hotel/Motel tax for purposes of funding their own multipurpose domed stadium facilities at the time that subsection (A) was passed had every opportunity to do so. We reject the idea that the Legislature is now forbidden from enacting legislation that affects the class of taxing entities covered under subsection (A) simply because only one taxing entity *chose* to take advantage of implementing a seven percent Hotel/Motel tax for purposes of funding a multipurpose domed stadium facility over twenty years ago. To determine otherwise would mean that this class would be forever off limits for further legislation by the General Assembly simply because only one

jurisdiction stepped into the previously open class. Indeed, even if the window has now closed for additional entities to begin funding their own multipurpose domed stadium facilities pursuant to subsection (A), that would not change the fact that the law itself is a general law that provided a proper class with reasonable taxing authority for funding a stadium facility if those class members *chose* to do so during the time frame in which they had an opportunity to do so. In this regard, like subsection (A), subsection (B) applies uniformly to all taxing authorities affected by it.

Likewise, the classification of the taxing authorities affected by subsection (B) is reasonable, in that (1) there is nothing arbitrary or unreasonable about allowing the same taxing entities that already have experience paying for a multipurpose domed stadium facility through the collection of a seven percent Hotel/Motel tax under OCGA § 48-13-51 (a) (5) (A) to collect such a tax in the future to fund a different stadium after the first tax has expired, and (2) the collection of a seven percent tax by these authorized entities on "the provision of public accommodations . . . is not arbitrary[,] as the[ ] businesses [subject to the tax] will directly benefit from an increase in tourism and the provision of local government services within the district" in which the new stadium facility

12

is being built. Youngblood, supra, 259 Ga. at 866 (2).

Accordingly, we find that OCGA § 48-13-51 (a) (5) (B) is constitutional.

2. Cottrell argues that the Hotel/Motel Tax Funding Agreement between the City and Invest Atlanta is illegal, and, by extension, unconstitutional,[2] because OCGA § 48-13-51 (a) (5) (B) requires that tax proceeds collected to fund the successor stadium facility "shall be expended only through a contract with the certifying state authority," and the City's contract with Invest Atlanta is not a contract with "the certifying state authority."[3] However, Cottrell ignores the fact that more than one contractual agreement exists to control the manner in which the NSP Tax Proceeds are ultimately expended by the Congress Center Authority to fund the NSP. Indeed, as explained more fully below, the Hotel/Motel Tax Funding Agreement works in conjunction with the Bond Proceeds Funding and Development Agreement to ensure that the NSP Tax Proceeds are expended in a manner consistent with the requirements of OCGA § 48-13-51 (a) (5) (B).

---

[2] Cottrell contends that the contract violates the Intergovernmental Contracts Clause of the Georgia Constitution. See Ga. Const. of 1983, Art. IX, Sec. III, Par. I (a).

[3] The Congress Center Authority is the certifying state authority.

13

OCGA § 48-13-51 (a) (5) (B) states in relevant part:

During the extended period of [Hotel/Motel Tax] collection [through December 31, 2050], the county or municipality shall further expend (in each fiscal year during which the tax is collected during the extended period of collection) an amount equal to 39.3 percent of the total taxes collected at the rate of 7 percent toward funding the successor facility certified by the state authority. Amounts so expended shall be expended only through a contract with the certifying state authority.

Pursuant to the Hotel/Motel Tax Funding Agreement, after Invest Atlanta issues the 2014 NSP Bonds, the City will pay the NSP Tax Proceeds to a bond trustee to whom the proceeds have been assigned by Invest Atlanta. The funds are used to pay the debt service on the bonds and are distributed from the bond trustee to the Congress Center Authority pursuant to a Bond Proceeds Funding and Development Agreement, which allows the Congress Center Authority, as the certifying state authority here, to expend the money to fund the New Stadium Project. In this manner, the City will meet its obligation to ensure that it "expend[s] [the NSP Tax Proceeds] toward the funding of a successor facility" while also making sure that the "[a]mounts so expended [to fund the New Stadium Project] shall be expended only through a contract with the certifying state authority." This arrangement complies with the requirements of OCGA § 48-13-51 (a) (5) (B), and Cottrell's argument to the contrary is without merit.

14

3. Cottrell asserts that the proposed bond transaction violates Ga. Const. of 1983, Art. IX, Sec. VI, Par. I and OCGA § 36-82-66 of the Revenue Bond Law because Invest Atlanta will not own or operate the NSP. Specifically, Cottrell contends that, because Invest Atlanta would not "own or operate" the New Stadium Project, the "revenue" to be paid to Invest Atlanta by the City would not actually be revenue "derived from the project." See Ga. Constitution of 1983, Art. IX, Sec. VI, Par. I ("The obligation represented by revenue bonds shall be repayable only out of the revenue derived from the project[.]"). See also OCGA § 36-82-66 ("Revenue bonds . . . shall not be payable from or charged upon any funds other than the revenue pledged to the payment thereof[.]"); OCGA § 36-82-61 (3) ("'Revenue' or 'revenue of the undertaking' means all revenues, income, and earnings arising out of or in connection with the operation or ownership of the undertaking[.]"). We disagree.

There is no requirement that Invest Atlanta own the New Stadium Project in order for it to issue revenue bonds to fund the project or for the tax proceeds paid to Invest Atlanta to be considered as part of the "revenue" to pay for the

bonds.[4] Indeed, pursuant to OCGA § 36-82-61 (3) of the Revenue Bond Law, "revenue" consists of "all revenues, income, and earnings arising out of *or in connection with* the operation or ownership of the undertaking." (Emphasis supplied.) Here, Invest Atlanta need not be the owner of the NSP, as the Hotel/Motel NSP Tax Proceeds are being collected "in connection with the [*Congress Center Authority's*] operation or ownership of the [NSP]." In this manner, the NSP Tax Proceeds qualify as lawful revenue, and Invest Atlanta need not actually own the NSP for this to be the case.

4. Cottrell further contends that the bond transaction here violates the Intergovernmental Contracts Clause (see Ga. Const. of 1983, Art. IX, Sec. III, Par. I (a)), in that the NSP is not an authorized "project" of Invest Atlanta. More specifically, Cottrell argues that, because the NSP is really a "project" of the Congress Center Authority, and not a project actually being developed by Invest Atlanta, the NSP is not eligible for bond financing under the Developmental Authorities Law. See OCGA § 36-62-2 (6) (H) (i) ("'Project' includes . . . [t]he

---

[4] Cottrell does not dispute whether tax funds may properly be included as part of the "revenue" to repay a bond issue. He contends only that, because Invest Atlanta will not "own or operate" the NSP, the tax funds collected here will not constitute "lawful" revenue.

16

acquisition, construction, improvement, or modification of any property, real or personal, which shall be suitable for or used as or in connection with . . . [s]ports facilities'"). Cottrell is incorrect.

Just as there is no requirement that Invest Atlanta own the NSP, there is also no requirement that Invest Atlanta actually construct the NSP in order to properly issue revenue bonds for the purpose of financing the project. Pursuant to the Developmental Authorities Law, Invest Atlanta has the power to "issue . . . revenue bonds . . . and to use the proceeds thereof for the purpose of paying all or part of the cost of *any project*" (OCGA § 36-62-6 (a) (13) (emphasis supplied)), not only those projects "constructed" or "developed" by the authority issuing the bonds. Nor is there any language in the Developmental Authorities Law that would otherwise prohibit Invest Atlanta from using bond proceeds to pay the costs of another government entity's project that "promote[s] trade, commerce, industry, and employment opportunities for the public good and the general welfare." OCGA § 36-62-9.  See also Youngblood, supra, 259 Ga. at 866 (2) (multipurpose stadium facility would benefit businesses subject to Hotel/Motel tax in that the facility would bring about "an increase in tourism"). This enumeration is without merit.

5. Cottrell argues that the trial court erred in failing to hold that City Resolution 13-R-0615, which extends Atlanta's existing Hotel/Motel tax to fund a portion of the construction and maintenance costs of the NSP, is illegal. He contends, primarily, that City Resolution 13-R-0615 is void because the City enacted it in March 2013, over a year before the Congress Center Authority provided the City with a tax certification required by OCGA § 48-13-51(a) (5) (B) to allow for the City to pass such a resolution.[5] Cottrell is mistaken.

In this regard, OCGA § 48-13-51(a) (5) (B) provides in relevant part that

> . . . a tax levied under this paragraph may be extended [past the December 31, 2020 termination date stated in OCGA § 48-13-51(a) (5) (A) (ii)] by resolution of the levying county or municipality and continue to be collected through December 31, 2050, if a state authority certifies [among other things]: (i) that the same portion of the proceeds will be used to fund a successor facility to the multipurpose domed facility as is currently required to fund the multipurpose domed facility under division (ii) of subparagraph (A) of this paragraph[.] . . .

By its plain terms, OCGA § 48-13-51 (a) (5) (B) dictates that a seven percent Hotel/Motel tax may be "*levied* . . . and continue to be *collected* through

[5] It is undisputed that the Congress Center Authority provided the certification prior to the final bond validation hearing.

December 31, 2050" to fund a successor facility if the appropriate certification is given by the state authority involved (in this case, the Congress Center Authority) (emphasis supplied.). It does not say that a city resolution cannot be written or passed in anticipation of the required certification. Nor does it say that a resolution passed before the city receives the certification would be rendered void. To the contrary, the statute requires that both the certification be given and the resolution passed before the City continues to levy and collect the seven percent Hotel/Motel tax beyond the December 31, 2020 termination date of the tax being collected to fund an initial multipurpose domed stadium facility pursuant to OCGA § 48-13-51 (a) (5) (A). In other words, while subsection (B) can be fairly read to imply that the certification must be given before a resolution is passed, there is nothing in the statute to imply that strict adherence to this chronological order of events is necessary in order for a city to pass a valid resolution or that the failure to adhere to this chronological order would have the extreme result of rendering prior authorizing actions void. In any event, here, both requirements have been met, as the City has passed a proper resolution and it has received the proper certification from the Congress Center

19

Authority.[6] Accordingly, City Resolution 13-R-0615 is not "void," as Cottrell argues.

6. Cottrell asserts that the trial court erred in adjudicating the validity of the O&M Agreement[7] in this case, because the Agreement did not act as "security" for the 2014 NSP Bonds. In this regard, he contends that, by answering any question regarding the validity of the O&M Agreement, the trial court violated its own self imposed limits on its "subject matter" jurisdiction. In its final validation order, the trial court stated that "[t]he purpose of this proceeding is to determine whether as a matter of law the proceedings for the issuance of the [2014 NSP] Bonds were lawfully conducted and the procedures

_____

[6] To the extent that Cottrell argues that City Resolution 13-R-0615 is void because OCGA § 48-13-51 (a) (5) (B) is an unconstitutional special law, that argument fails in light of our holding in Division 1 that the statute is constitutional. In addition, we find no merit to Cottrell's argument that the tax certification given by the Congress Center Authority in 2014 is allegedly defective, as the certification itself contains all of the information required by OCGA § 48-13-51 (a) (5) (B) and tracks all of the necessary components of the ongoing deal between the New Stadium Entities and the relevant parties who will bring the entire deal to fruition.

[7] Pursuant to this Agreement, the City will provide the Congress Center Authority with any portion of the NSP Tax Proceeds not required to pay the debt service (and related expenses) on the 2014 NSP Bonds, and the Congress Center Authority will apply any NSP Tax Proceeds it receives to operate and maintain the New Stadium Project.

were complied with, and whether as a matter of fact there is adequate security for the payment of the bonds." Validation Order at 5, n. 6. However, the trial court's statement has nothing to do with and no control over a superior court's jurisdiction "to hear and determine *all* questions of law and of fact in the [bond validation] case and . . . render judgment" on those issues. (Emphasis supplied.) OCGA § 36-82-77. See also  Berry v. City of East Point, supra, 277 Ga. App. 649, 650 (1) (627 SE2d 391) (2006) ("In a bond validation hearing, the role of the trial court is to determine whether the bond proposal is sound, feasible, and reasonable." [Cit.]) (Punctuation and footnote omitted). The validity of the O&M agreement was indeed placed in issue at the April 10, 2014 bond validation hearing, and the trial court committed no error in rendering a judgment on this issue. See OCGA § 36-82-77.

7. Finally, Cottrell urges that the trial court erred in failing to find that the O&M Agreement violates the Intergovernmental Contracts Clause of the State Constitution, in that this Agreement between the City and the Congress Center Authority requires the City to reimburse StadCo, a private company, for certain expenses incurred from events and other activities at the New Stadium Project. Again, we disagree.

21

Pursuant to the Intergovernmental Contracts Clause:

> The state, or any institution, department, or other agency thereof, and any county, municipality, school district, or other political subdivision of the state may contract for any period not exceeding 50 years with each other or with any other public agency, public corporation, or public authority for joint services, for the provision of services, or for the joint or separate use of facilities or equipment; but such contracts must deal with activities, services, or facilities which the contracting parties are authorized by law to undertake or provide. . . .

Ga. Const. of 1983, Art. IX, Sec. III, Par. I (a). Here, consistent with the Intergovernmental Contracts Clause, the O&M Agreement is solely between two governmental entities, the City and the Congress Center Authority; the period of the Agreement does not exceed fifty years; the Agreement "involve[s] the provision of services, or . . . the joint or separate use of facilities or equipment"; and it "deal[s] with activities, services, or facilities which the contracting parties are authorized by law to undertake or provide." The fact that StadCo pays some of the operating expenses for the NSP and is then reimbursed by the Congress Center Authority from funds that are specifically earmarked for covering "costs relating to the operation, maintenance and improvements for the New Stadium Project" does not somehow make the O&M Agreement invalid. The Congress

22

Center Authority is simply using the necessary funds to pay for the NSP as it is required to do in a manner consistent with its ownership of the NSP.[8]

Judgment affirmed. All the Justices concur.

Decided March 16, 2015 – Reconsiderations denied April 9 and 14, 2015.

OCGA § 48-13-51 (a) (b) (B); consitutional question. Fulton Superior Court. Before Judge Glanville.

Thelma W. Cummings Moore; John F. Woodham, for appellants.

Paul L. Howard, Jr., District Attorney; Samuel S. Olens, Attorney General, Denise E. Whiting-Pack, Senior Assistant Attorney General; Hunton &

---

[8] Nor would Cottrell's challenge to the individual clause of the O&M Agreement allowing for StadCo to approve any changes to the Agreement render the entire O&M Agreement invalid. See O&M Agreement § 7.4 ("This O&M Agreement may not be effectively amended, changed, modified, altered or terminated by the parties hereto without the concurring prior written consent of StadCo; provided StadCo shall not unreasonably withhold its consent."). Indeed, despite the existence of this clause, again, StadCo is not an actual party to the O&M Agreement, and the Agreement itself contains a severability clause that would leave the remainder of the Agreement intact even if this particular provision failed. See O&M Agreement § 7.3. Thus, even if we assume without deciding that the clause in question were invalid, our analysis regarding the overall validity and constitutionality of the O&M Agreement would remain unchanged.

Williams, Matthew J. Calvert, Douglass P. Selby, Ashley F. Cummings; Sutherland, Asbill & Brennan, Thomas W. Curvin, Matthew W. Nichols, for appellees.