In the Supreme Court of Georgia

Decided:   June 29, 2015

S15A0277.  LARRY SAVAGE v. STATE OF GEORGIA et al.
S15A0278.  RICHARD A. PELLEGRINO v. STATE OF GEORGIA et al.
S15A0279.  T. TUCKER HOBGOOD v. STATE OF GEORGIA et al.

NAHMIAS, Justice.

Appellants Larry Savage, Richard Pellegrino, and Tucker Hobgood challenge the trial court's validation of revenue bonds that will be used to help finance a new stadium in Cobb County for the Atlanta Braves major league baseball team. The bonds for the stadium project are to be issued pursuant to an intergovernmental agreement between Cobb County and the Cobb-Marietta Coliseum and Exhibit Hall Authority, under which the Authority agrees to issue bonds to cover much of the cost of constructing the stadium and the County agrees to pay the Authority amounts sufficient to cover the bond payments not covered by the licensing fees paid by the Braves. In these consolidated appeals, we conclude that the intergovernmental contract is valid; that the issuance of the bonds will not violate the Georgia Constitution's debt limitation clause,

gratuities clause, or lending clause or Georgia's revenue bond laws; and that the process used to validate the bonds was not deficient. We therefore affirm the trial court's judgment validating the stadium project bonds.

1. The Cobb-Marietta Coliseum and Exhibit Hall Authority was created in 1980 as "an instrumentality and a subordinate public corporation of the State of Georgia" for the purpose of "development and promotion in this state of the cultural growth, public welfare, education, and recreation of the people of this state." Ga. L. 1980, p. 4093, § 2. Since its creation, the Authority has overseen the construction of the Cobb Galleria Centre, Galleria Specialty Mall, and Cobb Energy Performing Arts Centre, and it continues to oversee the management of those complexes. In 2013, representatives from the Authority, Cobb County, and the Atlanta National League Baseball Club, Inc. (the Club) began to discuss building a new 41,500-seat stadium for the Braves in Cobb County.[1] Those discussions resulted in a Memorandum of Understanding, which was presented to and approved by the Authority on November 25, 2013. Based on that memorandum, the County, the Authority, and the Braves parties

---

[1] The Braves have played their home games in the City of Atlanta since moving from Milwaukee, playing at Atlanta-Fulton County Stadium from 1966 to 1996 and at Turner Field since 1997.

executed a number of documents on May 27, 2014, which form the basis of the stadium project.[2] The five main agreements are as follows:

(a) The Development Agreement: The Development Agreement provides that the Braves parties will oversee the construction of the stadium project with approval and oversight by the County. The Braves parties, who own the land on which the stadium will be built, will convey to the Authority the "stadium site," which will consist of the footprint of the stadium and any Authority parking areas. The Authority will retain title to the stadium site, and the Authority will also own "all real property constructed, installed and placed on the site," including the stadium, the public infrastructure, and "all items permanently affixed thereto and therein." The Braves parties will retain ownership of "certain specific Improvements, fixtures, furnishings, equipment, other . . . personal property to be placed in or upon the stadium and related property, and other tangible property," including items such as seating, scoreboards, lockers, and carpet. The Braves parties will also own and manage a "private stadium parking area of not less than 6,000 spaces." In addition, the

---

[2] The "Braves parties" consist of the Club, the Braves Stadium Company, LLC, the Braves Construction Company, LLC, and BRED Co., LLC. Although these entities are not all parties to every agreement, we will refer to them collectively for convenience.

3

Braves parties will own the land surrounding the stadium, where they intend to develop a mixed-use retail, entertainment, residential, hospitality, and office district.

The total cost of the stadium project is anticipated to be $622 million, with a maximum cost of $672 million. Revenue bonds issued by the Authority will pay for $368 million (about 55 to 60%) of the project. The Cumberland Community Improvement District will contribute $10 million to the project, and the County will contribute $14 million for transportation improvements.[3] The remaining cost will be paid by the Braves parties, with a contribution of at least $230 million and the option to increase that amount by $50 million as necessary. The Development Agreement specifies that none of the money coming from the government entities will be used for the "improvement or alteration of any privately-owned property." The project is scheduled to be completed by February 1, 2017.

(b) The Operating Agreement: The Operating Agreement grants the Braves parties a license for exclusive use of the stadium site, the stadium,

---

[3] These additional government expenditures are not at issue in this case, which involves only the validation of the bonds.

and the Authority's parking areas from May 27, 2014 until December 31, 2046, with an option to extend the license through December 31, 2051.[4] During this period, the Braves parties may lease or license use of these areas to third parties, and the County may hold three events per year at the stadium, totaling up to ten days per year. At the end of their license, the Braves parties must surrender the stadium site to the Authority or County but have the right to remove property owned by them unless such removal would result in the stadium "not being susceptible to use in its normal and customary manner as a multi-use sports facility."

During the period of the license, the Braves parties have a right to all revenues from the stadium, including from the Authority's parking areas and from advertising in the stadium and on any marquees built on the stadium site or on County land. The Braves parties also may sell the naming rights to the stadium and keep the resulting revenues. Beginning in 2017 and continuing as long as they retain the license, the Braves parties will pay the Authority a yearly license fee of $3 million, and during the 30-year term from the expected

---

[4] The Braves parties also entered a Non-Relocation Agreement, committing the team to play their home games at the new stadium from project completion in 2017 through the 2046 major league baseball season.

completion date in 2017 to the end of 2046, the Braves parties will pay an additional annual license fee of $3.1 million. When the Operating Agreement terminates, the Braves parties have the exclusive option to buy the stadium, stadium site, and/or Authority's parking areas for 50% of fair market value. The Operating Agreement states that the County and the Authority "believe that the development and construction of the Stadium will provide a significant and much needed catalyst for revitalization and continuing redevelopment of the property in the vicinity of the Stadium."

(c)    The Bond Resolution: The Bond Resolution, which was approved in nearly identical versions by the Authority and the County Commission, authorizes the Authority to issue revenue bonds for up to $397 million to finance the stadium project and cover the cost of issuing the bonds. The maximum principal and interest payment on the bonds shall not exceed $25 million per year, and the final maturity date of the bonds will be no later than 30 years after issuance, which coincides with the end of the Braves's initial license term.

The bonds are limited obligations of the Authority and "shall not constitute . . . an obligation, debt or a pledge of the faith and credit of the

6

County or the State of Georgia, nor shall the County or the State be subject to any pecuniary liability thereon." The Bond Resolution further explains that the bonds are payable only from the pledged security, which includes the stadium site assets owned by the Authority and the payments made under the Intergovernmental Agreement. The Bond Resolution recites that "[a]fter careful study and investigation, the Authority hereby determines that the Project is permitted by the [Authority's enabling act] and that financing, acquisition, construction, and equipping of the Project will be in furtherance of the Authority's public purpose." In the County's approval of the Bond Resolution, the County Commission recites its findings that the County's citizens will get "continuing recreational and other benefits from the Project" and that "the Project will promote tourism, promote the economy, and bring other benefits to the County and the State."

(d)    The Intergovernmental Agreement: To provide security for the bonds, the Authority and the County entered into the Intergovernmental Agreement (IGA). Under the IGA, the Authority agrees to issue the bonds, and the County in turn agrees to pay an amount sufficient to cover the principal and interest on the bonds as well as the administration costs and other reasonable

7

fees incurred by the Authority in connection with the bonds and the stadium project. The County will do so using "any funds lawfully available to it," and to the extent those funds do not cover the payments, the County agrees to levy ad valorem property taxes as necessary.[5] The license fees the Authority receives from the Braves parties will also be put toward payment of the bonds.

In the IGA, the Authority appoints the County as its agent and representative for constructing the project on the Authority's behalf, and the County agrees to take responsibility for all project-related duties, including overseeing the Braves parties as outlined in the Development and Operating Agreements.[6] The IGA recites that its term will not exceed 50 years and that when the bonds are no longer outstanding and the Operating Agreement has terminated, the County will have the right to acquire title to the Authority's

---

[5] The County's financing plan submitted with the Memorandum of Understanding indicates that the County plans to use hotel/motel and rental car taxes as well as reallocation of ongoing annual revenue to make the payments.

[6] The County's responsibilities include selecting a construction manager, who will be obligated to ensure that the stadium project is constructed and equipped within the budget and time set out in the project documents. The County will also designate a project manager, who will oversee the project and review and approve each application for payment of construction costs from the trust. The Braves parties will submit stadium design documents to the County for review and comment, and when the County requests, the Braves parties must provide a list of all contractors and subcontractors working on the project.

8

property in the project.

(e) The Trust Indenture: The Trust Indenture is an agreement between the Authority as the bond issuer and the U.S. Bank National Association establishing a trust. The trustee is assigned the right to receive the payments made by the County under the IGA and the license fees paid by the Braves parties, and also holds a security interest in the stadium project's property. The agreement defines the bonds as limited obligations of the Authority payable solely from the trust estate, and the trustee promises to pay the amount of the bonds only from the trust estate. If the Authority defaults on its obligations, the trustee is given the rights and remedies that the Authority has against the project under the IGA.

2. After all of these agreements were entered, the Authority notified the Cobb County district attorney that it proposed to issue the revenue bonds. A bond validation hearing was then scheduled in the Cobb County Superior Court, and after notice was published on June 27 and July 4, 2014 in the Marietta Daily Journal, the hearing was held on July 7. By the time of the hearing, the court had received 16 motions to intervene from Cobb County residents, including the three Appellants in this case; nine of the residents,

including the three Appellants, appeared at the hearing and were permitted to intervene and present evidence and oral argument. At the hearing, the State proffered the relevant documents, and Hobgood called witnesses and proffered other evidence. Some of Hobgood's proffered evidence related to the negotiations between the County, Authority, and Braves parties, but the trial court sustained the Authority's objections that the negotiations were not relevant to the validity of the bonds. On July 25, 2014, the trial court issued a 38-page order confirming and validating the stadium project bonds. Each Appellant filed a timely notice of appeal, and the three appeals were consolidated for decision by this Court. The Court heard oral arguments on February 3, 2015.[7]

3. "[W]hether a proposal to issue bonds is sound, feasible, and reasonable is a question for the trial court, and its findings about soundness, feasibility, and reasonableness must be sustained on appeal if there is any evidence to support them." Greene County Dev. Auth. v. State, 296 Ga. 725, 726 (770 SE2d 595) (2015). Of course, if the issuance of the bonds would be illegal, they cannot be validated. See Nations v. Downtown Dev. Auth. of the

---

[7] At the bond validation hearing, all of the intervenors appeared pro se. On appeal, Savage and Hobgood (who is an attorney) are representing themselves. Pellegrino is now represented by attorney Gary Pelphrey, who was an intervenor in the trial court but did not appeal.

10

City of Atlanta, 255 Ga. 324, 328 (338 SE2d 240) (1986) (Nations I) (invalidating two provisions of a bond resolution because they violated the Georgia Constitution). Compare Reed v. State, 265 Ga. 458, 459 (458 SE2d 113) (1995) ("Because the contractual payments [guaranteeing the bonds] are a lawful source of income, and the trial court had the contract before it, there was evidence to support the trial court's findings of feasibility.").

There is no dispute that the bonds for the stadium project are adequately secured by the County's pledge under the Intergovernmental Agreement to cover all bond costs not covered by the license fees paid by the Braves parties. The challenges to the bond proposal instead rest on claims, made by the three Appellants in various combinations, that the IGA is not a valid intergovernmental contract under the Georgia Constitution, and that the issuance of the bonds violates the Constitution's debt limitation clause, gratuities clause, and lending clause, as well as Georgia's revenue bond laws. For the reasons discussed below, these arguments fail, and we therefore conclude that the trial court did not err in validating the bonds. Pellegrino and Hobgood also raise several challenges to the procedures used in validating the bonds, all of which we conclude are meritless.

11

4.	We begin by addressing whether the Intergovernmental Agreement between the County and the Authority is a constitutionally valid intergovernmental contract. See Ga. Const. of 1983, Art. IX, Sec. III, Par. I (a).[8] The Constitution establishes four main requirements for such contracts, and the IGA clearly meets the first two: it is a contract between "political subdivision[s] of the state" and it is for a period "not exceeding 50 years." Id. Savage and Hobgood argue, however, that the IGA fails to meet the other two requirements, asserting that it is not for "joint services, for the provision of services, or for the joint or separate use of facilities or equipment," and that it does not "deal with activities, services, or facilities which the contracting parties are authorized by law to undertake or provide." Id. They are incorrect.

---

[8] The intergovernmental contracts clause says, in relevant part:

The state, or any institution, department, or other agency thereof, and any county, municipality, school district, or other political subdivision of the state may contract for any period not exceeding 50 years with each other or with any other public agency, public corporation, or public authority for joint services, for the provision of services, or for the joint or separate use of facilities or equipment; but such contracts must deal with activities, services, or facilities which the contracting parties are authorized by law to undertake or provide. By way of specific instance and not limitation, a mutual undertaking by a local government entity to borrow and an undertaking by the state or a state authority to lend funds from and to one another for water or sewerage facilities or systems or for regional or multijurisdictional solid waste recycling or solid waste facilities or systems pursuant to law shall be a provision for services and an activity within the meaning of this Paragraph.

12

(a) We first consider the Intergovernmental Agreement's subject matter. Unlike the local authorities in cases like Frazer v. City of Albany, 245 Ga. 399 (265 SE2d 581) (1980), and Nations v. Downtown Development Authority of the City of Atlanta, 256 Ga. 158 (345 SE2d 581) (1986) (Nations II), the Authority here will not be leasing the stadium to the County for its own primary use; instead, the facility is being licensed exclusively to the Braves parties for at least the first 30 years after completion. Thus, the IGA is not for the joint or separate *use* of facilities by the government parties. However, the IGA does qualify as a contract for *services*. The Authority agrees to issue the bonds, to acquire and hold title to the real property involved in the stadium project, and to license the property to the Braves parties. And the County agrees to appoint construction and project managers and to oversee the design and construction of the stadium that the Authority will own for at least as long as the bonds are outstanding.

Savage and Hobgood argue that the services provided by the Authority are insufficient. It is true that the IGA differs from the contracts considered in previous cases in which the local authority provided more extensive services, such as managing the construction or operation of the project. See, e.g., Avery

13

v. State, 295 Ga. 630, 630 (761 SE2d 56) (2014) ("The IGA obligates the Airport Authority to operate, maintain, and provide the facilities necessary to use the improved taxiway."); Frazer, 245 Ga. at 399-400 (explaining that the Albany-Dougherty Inner-City Authority would acquire the land for a civic hall, lease it to the city, and hire a manager to oversee construction).

This difference, however, does not render the IGA invalid. The Authority is providing services that it is authorized to provide, as discussed below, and those services are proper subjects for an intergovernmental contract. See Nations I, 255 Ga. at 328 (indicating that a contract "for the issuance of the bonds" would be a contract for services within the meaning of the intergovernmental contract clause); Frazer, 245 Ga. at 400 (discussing a contract under which a local authority provided the "service of issuing revenue bonds"). See also Ga. Const. of 1983, Art. IX, Sec. III, Par. I (a) ("By way of specific instance and not limitation, a mutual undertaking by a local government entity to borrow and an undertaking by the state or a state authority to lend funds from and to one another for water or sewerage facilities or systems or for regional or multijurisdictional solid waste recycling or solid waste facilities or systems pursuant to law shall be a provision for services and an activity within the

14

meaning of this [intergovernmental contracts] Paragraph."). Moreover, the County is also providing services that are proper subjects of an intergovernmental contract, a point that Savage and Hobgood do not address.

(b) We next consider whether the Intergovernmental Agreement "deal[s] with activities, services, or facilities which the contracting parties are authorized by law to undertake or provide." The laws creating and governing the Cobb Coliseum and Exhibit Hall Authority authorize it to undertake "projects," which are defined to include

> the acquisition, construction, equipping, maintenance and operation of multi-use coliseum and civic center type facilities to be used for athletic contests, games, meetings, trade fairs, expositions, political conventions, agricultural events, . . . theatrical and musical performances, conventions and other public entertainments, and the usual facilities related thereto, including, without limitation, refreshment stands and restaurants, and facilities for the purveying of foods, beverages, publications, souvenirs, novelties and goods of all kinds, whether operated or purveyed directly or indirectly through concessions, licenses, leases or otherwise, parking facilities or parking areas in connection therewith, recreational centers and areas including, but not limited to, gymnasium and athletic facilities and related buildings, and the usual and convenient facilities appertaining to such undertakings and the extension and improvements of such facilities, acquiring the necessary property therefore, both real and personal and the lease, sale and licensing of any part or all of such facilities, including real and personal property, to any persons, firms or corporations whether public or private so as to assure the efficient and proper development,

15

maintenance and operation of such facilities and areas, deemed by the authority to be necessary, convenient, or desirable.

Ga. L. 1980, p. 4096, § 5 (2). The Authority is also empowered to issue revenue bonds to pay the costs of "the acquisition, construction, reconstruction, improvement, addition to, or extension of such project." Id., p. 4100, § 6 (7). Accord Cobb County Ord. § 2-187 (7). Thus, the Authority is plainly authorized to acquire and license the stadium site, including the stadium, infrastructure, and other improvements made to it, which will be used for "athletic contests," "games," and "other public entertainments," and to issue bonds to cover the costs of this "project."

As for the County, the Constitution authorizes it to provide "[p]arks, recreational areas, programs, and facilities." Ga. Const. of 1983, Art. IX, Sec. II, Par. III (a) (5). Savage and Hobgood argue that the proposed stadium does not qualify as a "park" or a "recreational" facility, relying on Anderson v. Atlanta Committee for the Olympic Games, Inc., 273 Ga. 113 (537 SE2d 345) (2000). But that case actually cuts against their argument.

In Anderson, this Court rejected a constitutional vagueness challenge to the term "recreational purposes" as used in the Recreational Property Act,

16

OCGA §§ 51-3-20 to 51-3-26, by looking to the ordinary meaning of the term "recreation," which is "any amusement, play or other form of relaxation which refreshes the mind or body." See Anderson, 273 Ga. at 115 (citing Ballentine's Law Dictionary 1071 (3rd ed. 1969)). See also Webster's Third New International Dictionary 1899 (1966) (defining "recreation" as "refreshment of the strength and spirits after toil" and "a means of getting diversion or entertainment"). We similarly presume that the words used in the Constitution bear their ordinary meanings at the time those words were included. See Warren v. State, 294 Ga. 589, 590 (755 SE2d 171) (2014).

Under the ordinary meaning of "recreational," a stadium and surrounding area designed for people to gather together to watch and enjoy baseball games – our traditional "national pastime" – and other athletic and entertainment performances certainly qualifies as a "recreational area" and a "recreational facility." See Youngblood v. State, 259 Ga. 864, 867 (388 SE2d 671) (1990) (describing the proposed Georgia Dome as a "facility for recreational use and benefit of the citizens"). See also New Jersey Sports & Exposition Auth. v. McCrane, 292 A2d 580, 595 (N.J. 1971) ("'A sports stadium is for the recreation of the public and is hence for a public purpose . . . .'" (citation

17

omitted)). The County is therefore authorized to provide such a stadium, directly or through contracts with public or private entities. See Mesteller v. Gwinnett County, 292 Ga. 675, 676-677 (740 SE2d 605) (2013) (explaining that a county may choose to provide a constitutionally authorized service through a contract with a private company). And the County may use any revenue at its disposal to provide the funding for that permissible project, including its general tax revenue. See Clayton County Airport Auth. v. State, 265 Ga. 24, 26 (453 SE2d 8) (1995) ("The pledge of the County's 'taxing power is permissible under the intergovernmental contracts clause.'" (quoting Nations II, 256 Ga. at 162)).[9]

(c) Finally, Savage and Hobgood argue that even if the Authority and the County are authorized to provide *a* stadium, they are not authorized to provide *this* stadium, because it will not benefit the public. They point to the laws governing the Authority, which require that its projects "shall be for the development and promotion in this state of the cultural growth, public welfare,

---

[9] The subsequent portions of Anderson to which Savage and Hobgood point, which discuss how courts should distinguish between recreational and commercial purposes in determining the tort immunity of property owners who have made their property available to the public for "recreational purposes" as that term is used in OCGA § 51-3-20, see Anderson, 273 Ga. at 115-117, are not relevant to the issue presented here, and we render no opinion as to whether and under what conditions the County, the Authority, or the Braves parties might be protected by the Recreational Property Act.

education, and recreation of the people of this state." Ga. L. 1980, p. 4099, § 6 (5); Cobb County Ord. § 2-187 (5). Similarly, the Constitution says that the County "may expend public funds to perform any public service or public function as authorized by this Constitution or by law or to perform any other service or function as authorized by this Constitution or by general law." Ga. Const. of 1983, Art. IX, Sec. IV, Par. II.

Savage and Hobgood maintain that the stadium project is not for public benefit because it will be used exclusively by the Braves parties for at least the first 30 years after completion.[10] As reflected in the Operating Agreement, however, the Authority and the County made a specific determination that this project will benefit the public by providing "a significant and much needed catalyst for revitalization and continuing redevelopment of the property in the vicinity of the stadium." Further, in approving the Bond Resolution, the Authority determined that "the financing, acquisition, construction, and equipping of the Project will be in furtherance of the Authority's public purpose," and the County determined that the project will provide its citizens

---

[10] In fact, while the Braves parties will control almost all use, the County will have direct use of the stadium three times a year for up to 10 days.

19

"continuing recreational benefit and other benefits" and "will promote tourism, promote the economy, and bring other benefits to the County and the State."

Savage and Hobgood do not dispute that the stadium project will provide these anticipated benefits to the public. Instead, they assert that the private benefits conferred on the Braves parties somehow eliminate any public benefits. The public benefits anticipated here are similar to the benefits anticipated by Paulding County and the Paulding County Airport Authority in deciding to fund and issue bonds to expand the county airport's taxiway. See Avery, 295 Ga. at 632. Although the authority in Avery planned to lease a large part of the airport terminal to a commercial airline that would use the expanded taxiway, and that airline (like the Braves parties) planned to benefit by charging citizens for tickets, this Court concluded that the project could be undertaken because the expansion would provide public benefits to the county including a safer airport and new jobs – much like the increased tourism and other economic benefits that are reasonably anticipated from the stadium project. See id. at 632-633.

Nor does it matter that some of the benefits to the public will be directly provided by the Braves parties rather than by the government parties, since it is well-established in Georgia law that government entities may contract with

20

private entities to provide public services. See Mesteller, 292 Ga. at 676 (upholding contract between a county and a private company to provide garbage collection services); Strykr v. Long County Bd. of Commrs., 277 Ga. 624, 626 (593 SE2d 348) (2004) (same). See also Smith v. Board of Commrs. of Roads & Revenues of Hall County, 244 Ga. 133, 141 (259 SE2d 74) (1979) ("The fact that the private contractor is paid for its services and may make a profit under such a contract does not invalidate the contract provided the county or its residents receive the services required."). Likewise, the fact that admission fees will be charged does not prevent the stadium from providing public benefits. Indeed, the admission fees may help fund the jobs and other economic benefits that the County and Authority expect the project to create. See Nations II, 256 Ga. at 159-161 (approving an intergovernmental contract and bonds to develop Underground Atlanta, with plans to lease the buildings to private businesses); Youngblood, 259 Ga. at 866-867 (upholding an intergovernmental agreement between a city, county, and local authority, and approving bonds for construction and operation of the Georgia Dome).

We will defer to the express findings of the Authority and the County that the stadium project will provide public benefits, particularly where those

findings do not appear unreasonable and Appellants have presented no actual evidence to the contrary.

> Whether the contract now in question is one which will benefit the taxpayers . . . is a question properly for determination in the first instance by the County Commission and finally by actual experience. We are bound by the appellate decisions holding that unless there is an abuse of discretion . . . courts should not substitute their judgment or interfere with governing authorities in the proper exercise of their judgment concerning such matters.

Smith, 244 Ga. at 141 (emphasis removed).

For these reasons, the Intergovernmental Agreement is valid under the intergovernmental contracts clause of the Constitution.

5. Savage and Hobgood next contend that even if the Intergovernmental Agreement meets the requirements of the intergovernmental contract clause, the issuance of the stadium project bonds violates the Constitution's debt limitation clause, which says in relevant part:

> The debt incurred by any county, municipality, or other political subdivision of this state, including debt incurred on behalf of any special district, shall never exceed 10 percent of the assessed value of all taxable property within such county, municipality, or political subdivision; and no such county, municipality, or other political subdivision shall incur any new debt without the assent of a majority of the qualified voters of such county, municipality, or political subdivision voting in an election held for that purpose as provided by law.

22

Ga. Const. of 1983, Art. IX, Sec. V, Par. I (a). Appellants do not contend that the bonds will cause the County or the Authority to exceed the total debt limit, but they allege that the bond issuance violates the second portion of the clause because no referendum will be held for the County's voters to approve (or disapprove) new debt. We disagree.

(a) We consider first whether the Authority would violate the debt limitation clause by issuing these revenue bonds.[11] The revenue bond provision of the Constitution says unequivocally: "The obligation represented by revenue bonds shall be repayable only out of the revenue derived from the project and shall not be deemed to be a debt of the issuing political subdivision." Ga. Const. of 1983, Art. IX, Sec. VI, Par. I. The revenue bond statute drives this point home, stating that the issuing government body will not be subject to any pecuniary liability because "[r]evenue bonds issued under this article shall not be payable from or charged upon any funds other than the revenue pledged to the payment thereof," and

> [n]o holder or holders of any such bonds shall ever have the right
> to compel any exercise of the taxing power of the [issuing]

---

[11] We address the validity of the stadium project bonds as revenue bonds in Division 8 below.

governmental body to pay any such bonds or the interest thereon, nor to enforce payment thereof against any property of the governmental body; nor shall any such bonds constitute a charge, lien, or encumbrance, legal or equitable, upon any property of the governmental body.

OCGA § 36-82-66.

In line with the revenue bond laws, the Bond Resolution specifically recites that the stadium project bonds are limited obligations of the Authority, payable only from the pledged security, and the Trust Indenture similarly provides that the bonds are to be paid only with funds pledged to the trust estate. If the Authority defaults on the bonds, the bond holders' only recourse is to step into the shoes of the Authority as to the stadium project; only the project property and the revenues from the IGA and the Braves parties' license fees are pledged as security for the bonds. In sum, the Authority clearly will not violate the debt limitation clause by issuing the bonds.

(b)     Our conclusion that the County is also not violating the debt limitation clause requires more extensive explanation. The County has no direct liability for the stadium project bonds; indeed, the Bond Resolution expressly declares that the bonds "shall not constitute . . . an obligation, debt, or a pledge of the faith and credit of the County or the State of Georgia, nor shall the County

24

or the State be subject to any pecuniary liability thereon." Thus, a bondholder could not sue the County directly for payment on the bonds or directly compel any exercise of the County's taxing power.

Unlike the Authority, however, the County is not avoiding debt entirely, because under the terms of the Intergovernmental Agreement, the County agrees to pay the Authority up to $25 million per year for the next 30 years to cover the principal, interest, and other costs of the bonds not covered by the Braves parties' license fees. By contractually pledging its funds to pay for the bonds, the County is incurring a new liability. But this debt is not controlled by the debt limitation clause, because the County's pledge is made through a valid intergovernmental contract. And this Court has squarely held in multiple decisions, under each of the last three Georgia Constitutions and in each of the last seven decades, that debt incurred under a valid intergovernmental contract is not subject to the debt limitation clause.

We first held this when construing the 1945 Constitution in Sheffield v. State School Building Authority, 208 Ga. 575 (68 SE2d 590) (1952). The Court harmonized the intergovernmental contract clause with the debt limitation clause by concluding that debts incurred pursuant to intergovernmental contracts are

governed by the clause regulating those contracts and are not subject to the debt limitation clause. See id. at 581-582. The holding in Sheffield was followed in State v. Georgia Rural Roads Authority, 211 Ga. 808, 811-812 (89 SE2d 204) (1955); Stephenson v. State, 219 Ga. 652, 652-653 (135 SE2d 380) (1964); and Thompson v. Municipal Electric Authority of Georgia, 238 Ga. 19, 20-21 (231 SE2d 720) (1976) (applying the 1945 Constitution). After the 1976 Constitution took effect, the Court twice again held that a local government's agreement to pay money made in a valid intergovernmental contract is not a debt subject to the debt limitation clause. See Frazer, 245 Ga. at 400-401; Building Auth. of Fulton County v. State of Georgia, 253 Ga. 242, 249 (321 SE2d 97) (1984).

Shortly after our current Constitution took effect in 1983, this Court again adhered to our holding reconciling the intergovernmental contracts and debt limitation clauses, explaining that the intergovernmental contracts clause "carves out exceptions" to the debt limitation clause. Nations I, 255 Ga. at 327. See also Nations II, 256 Ga. at 160 ("It is clear a municipality may enter into a contract authorized by the intergovernmental contracts clause for the future expenditure of funds without violating the debt clause of Art. IX, Sec. V, Par. I (a) [of the 1983 Constitution]."). We have confirmed this holding under the

26

1983 Constitution on numerous occasions, including just a year ago. See Avery, 295 Ga. at 631-632; City of Decatur v. Dekalb County, 289 Ga. 612, 614 (713 SE2d 846) (2011); Reed, 265 Ga. at 459; Clayton County Airport Auth., 265 Ga. at 24-25; Ambac Indem. Corp. v. Akridge, 262 Ga. 773, 775 (425 SE2d 637) (1993); Youngblood, 259 Ga. at 867.

Savage alone argues that we should ignore all of this precedent and instead follow DeJarnette v. Hospital Authority of Albany, 195 Ga. 189 (23 SE2d 716) (1942), which held that intergovernmental contracts were subject to the requirements of the debt limitation clause. See id. at 204-205. That holding in DeJarnette, however, was expressly distinguished in Sheffield and has not been followed since, because its reasoning is no longer applicable. DeJarnette relied on the fact that the provision for intergovernmental contracts that was added to the Constitution of 1877 in 1941 was an amendment to the section of the Constitution relating to the powers of counties to levy taxes; thus, the Court reasoned, the provision was not meant to "relax or affect the existing constitutional provisions and limitations as to the incurring of debts by political subdivisions." DeJarnette, 195 Ga. at 190. When a similar issue was raised under the 1945 Constitution in Sheffield, however, the Court rejected

27

DeJarnette, holding that because the intergovernmental contracts clause and the debt limitation clause were now both original portions of the Constitution, they were entitled to "equal dignity and effect" and must be read in harmony with each other. Sheffield, 208 Ga. at 581. The practical reality was (and is) that if a public referendum was required every time one government entity wanted to enter a contract with another government entity promising to pay any amount of money, the intergovernmental contracts clause would be rendered almost nugatory.

Savage's argument that we should return to DeJarnette notes a change to the language of the debt limitation clause that occurred with the enactment of the 1983 Constitution. The 1945 and 1976 versions of the clause applied to any "debt hereafter incurred by any county, municipal corporation or political division of this State *except as in this Constitution provided for*." Ga. Const. of 1945, Art. VII, Sec. VII, Par. I; Ga. Const. of 1976, Art. IX, Sec. VII, Par. I. The italicized phrase was removed in the 1983 Constitution, but the substance of the clause was not modified in any way relevant here, and this Court's interpretation of the clause in relation to the intergovernmental contracts clause – which remained a full-fledged portion of the Constitution – was not changed.

28

While the Sheffield Court noted the removed phrase in support of its holding, we have found – and Savage has identified – nothing in the drafting history of the 1983 Constitution or the public debate over its ratification that indicates that the understanding of the interaction between the debt limitation clause and the intergovernmental contracts clause established in Sheffield and followed in subsequent cases was meant to be altered. Indeed, the evidence we have found indicates the opposite – that no substantive change of this nature was intended. See Select Committee on Constitutional Revision, 1977-1981, Legislative Overview Committee, Vol. I, Transcript of Meeting of June 30, 1981, p. 61 (describing changes to the debt limitation clause as "principally an editorial revision" and characterizing the relevant paragraph in the new Constitution as "a restatement of the present constitutional provision").

Moreover, the doctrine of stare decisis strongly counsels adherence to our longstanding, consistent, and workable precedents on this issue. See Ga. Dept. of Natural Resources v. Center for a Sustainable Coast, Inc., 294 Ga. 593, 601 (755 SE2d 184) (2014) (discussing stare decisis considerations). While the doctrine is less compelling with regard to our constitutional decisions, which are harder for the democratic process to correct than our interpretations of statutes,

29

see id., stare decisis is especially important where judicial decisions create substantial reliance interests, as is most common with rulings involving contract and property rights. See State v. Hudson, 293 Ga. 656, 661 (748 SE2d 910) (2013); Rogers v. Carmichael, 184 Ga. 496, 511 (192 SE 39) (1937) ("[T]he rule of stare decisis is usually considered as one more appropriately applied to vested property rights."); Robinson v. Colonial Discount Co., Inc., 106 Ga. App. 274, 276 (126 SE2d 824) (1962) ("'The court has found adherence to the settled rule especially desirable in cases involving the security of contracts, property interests, wills and trusts and commercial transactions in general.'" (citation omitted)).

That is the situation here. A ruling that intergovernmental contracts are no longer an exception to the debt limitation clause would affect *every* intergovernmental agreement in which any political subdivision of this State agrees to pay any amount of money for a facility or service, not just the relatively few contracts like the IGA here that involve payments used to defray revenue bonds issued by the counter-party. Because no intergovernmental contract would be valid without the approval of a majority of the voters in the political subdivision, overruling our precedents would cast into doubt countless

30

existing contracts entered without a referendum, as well as plans for future contracts, for a wide variety of facilities and services ranging from hospitals, roads, and recreation facilities to police, fire, animal control, and other public safety services. See, e.g., Ga. Const. of 1983, Art. IX, Sec. III, Par. I (c) (providing that counties and municipalities may contract with public agencies, corporations, or authorities "for the care, maintenance, and hospitalization of its indigent sick and may as part of such contract agree to pay for the cost of acquisition, construction, modernization, or repairs"); Butler v. Carlisle, 299 Ga. App. 815, 816 (683 SE2d 882) (2009) (discussing services provided to the City of Dawsonville by the Dawson County Sheriff's Department pursuant to an intergovernmental agreement); Op. Atty. Gen. 2012-7 (discussing intergovernmental agreements between a city and county for probation services).

For all of these reasons, we adhere to the holding of Sheffield and its many progeny and conclude that the County's promise to pay for the stadium project bonds is not a debt regulated by the Constitution's debt limitation clause because the promise was made as part of a constitutionally valid intergovernmental contract.

6.   Under the Intergovernmental Agreement, it is clear that the services

the Authority will provide constitute contractual consideration to the County, meaning that, contrary to another claim by Savage and Hobgood, the IGA does not violate the Constitution's gratuities clause. See Ga. Const. of 1983, Art. III, Sec. VI, Par. VI (a) (1) ("Except as otherwise provided in the Constitution, (1) the General Assembly shall not have the power to grant any donation or gratuity or to forgive any debt or obligation owing to the public . . . ." ); City of Lithia Springs v. Turley, 241 Ga. App. 472, 475 (526 SE2d 364) (1999) (applying this provision to the actions of counties and cities). This Court has repeatedly held that an impermissible gratuity is not provided when a political subdivision receives a substantial benefit in exchange for its payments. See, e.g., Avery, 295 Ga. at 633. See also Building Auth. of Fulton County, 253 Ga. at 249 (holding that the gratuities clause is not violated when "the payments are to be made pursuant to binding agreements and in return for bargained-for consideration"). The County found the Authority's services to be sufficient consideration for the promised payments. To the extent Savage and Hobgood contend that the County will not receive *enough* benefits from the IGA – that the County did not drive the best bargain – "[t]his court cannot decide whether the [County] commissioners made the correct decision, but only whether it was a lawful one."

32

Smith, 244 Ga. at 138.

7. The Intergovernmental Agreement also does not violate the Constitution's lending clause, which says that a county is prohibited "through taxation, contribution or otherwise, to appropriate money for or lend its credit to any person or to any nonpublic corporation or association except for purely charitable purposes." Ga. Const. of 1983, Art. IX, Sec. II, Par. VIII. The County is not paying, with appropriated funds or credit, for anything to be owned by the Braves parties; the stadium and stadium site will be owned by the Authority, with the Braves paying license fees to the Authority, for at least 30 years, at the end of which the bonds the County is helping to pay off will be fully redeemed. In fact, the Development Agreement specifies that no money coming from the government entities will be used for the "improvement or alteration of any privately-owned property." See Smith, 244 Ga. at 140-141 (rejecting the argument that the county was extending its credit to a private fire services company where "[t]he County is simply paying the debt it incurred to purchase and construct the properties, and is allowing the use of those properties as partial consideration for [the private company's] promise to provide fire protection").

33

8.    Savage and Pellegrino argue that the bonds should not be validated because they do not comply with the requirements set forth in the constitutional provision and statutes governing revenue bonds. The Constitution provides that a "political subdivision of this state may issue revenue bonds as provided by general law." Ga. Const. of 1983, Art. IX, Sec. VI, Par. I. The revenue bond law authorizes political subdivisions "[t]o issue revenue bonds to finance, in whole or in part, the cost of the acquisition, construction, reconstruction, improvement, betterment, or extension of any undertaking." OCGA § 36-82-62 (a) (3) (A). An "undertaking" is defined as "revenue-producing undertakings" including, among many other things, "athletic fields, grandstands and stadiums; [and] buildings to be used for various types of sports, including baseball and football." OCGA § 36-82-61 (4) (E). The stadium project fits squarely within this definition. See Cottrell v. Atlanta Dev. Auth., Case No. S14A1874, slip op. at 15-16 (decided Mar. 16, 2015) (approving revenue bonds issued to fund a new stadium in the City of Atlanta for the Atlanta Falcons professional football team).

Revenue bonds must be funded solely from "the revenue pledged to the payment thereof," OCGA § 36-82-66, which is defined as "all revenues, income,

34

and earnings arising out of or in connection with the operation or ownership of the undertaking . . . ." OCGA § 36-82-61 (3). See also Ga. Const. of 1983, Art. IX, Sec. VI, Par. I ("The obligation represented by revenue bonds shall be repayable only out of the revenue derived from the project and shall not be deemed to be a debt of the issuing political subdivision."). The bonds at issue here meet this requirement. The license fees paid by the Braves parties to use the stadium will cover part of the bond payments, and the remainder will come from payments made by the County under the Intergovernmental Agreement. This Court has repeatedly held that when revenue bonds are contemplated as part of a valid intergovernmental contract, payments made under the contract constitute project revenue. See, e.g., Reed, 265 Ga. at 459 ("So long as the intergovernmental contract is for a purpose authorized by the Constitution, it is a valid means of providing revenue to the Authority to be used to pay the bonds."); Clayton County Airport Auth., 265 Ga. at 24-25 (holding that the county's promise to pay "amounts sufficient to enable the Authority to pay the principal and interest on" the revenue bonds, made pursuant to a valid intergovernmental contract, "represents the Authority's lawful 'revenue pledged

35

to the payment of" its bonds").[12]

Although the County promises to levy ad valorem taxes if necessary to satisfy its commitments under the IGA, that promise does not make the bonds general obligation rather than revenue bonds. See OCGA §§ 36-82-1 to 36-82-10 (establishing the requirements for general obligation bonds). The County's liability here is under a contract, not a bond, and it is well-established that the County may pledge its full faith and credit to meet such contractual obligations. As this Court explained in Clayton County Airport Authority:

> Although the bonds are obligations of the Authority and the County cannot pledge its full faith and credit to pay them, the County does have the "authority under [the intergovernmental clause of] the Constitution, to enter into contracts with the Authority and to pledge [its] full faith and credit and levy taxes to meet [its] contractual obligations pursuant to the law of contracts."

265 Ga. at 26 (citations omitted).

9.    Finally, Pellegrino, joined by Hobgood on one point, presents several challenges to the validity of the bond validation proceeding, none of

---

[12] This reasoning also dispenses with Savage's contention, made under the similar local law, that the Authority cannot undertake the stadium project because the project is not self-liquidating. See Ga. L. 1980, p. 4091 § 5 (5) (requiring that any project undertaken by the Authority be "self-liquidating" and defining "self-liquidating" projects as those in which "the revenues and earnings to be derived by the authority therefrom . . . will be sufficient to pay the principal and interest of the revenue bonds which may be issued to finance . . . the cost of such project or projects.").

which are persuasive.

(a)     Pellegrino argues first that there was not sufficient notice of the validation hearing. The hearing was held on Monday, July 7, 2014. As required by the revenue bond law, notice of the hearing was provided in the Marietta Daily Journal the preceding two weeks, on June 27 and July 4. See OCGA § 36-82-76 (requiring that notice informing the public of the date of the bond validation hearing be published in the official organ of the county "once during each of the two successive weeks immediately preceding the week in which the hearing is to be held").

Shortly after the first notice was published, the judge of the Cobb County Superior Court to whom the case was originally assigned, and who was listed in the June 27 notice as the judge who would be presiding, recused himself. The case was then assigned to another judge of the same court, whose name and courtroom number were included in the July 4 notice, which also expressly noted the change in courtroom. On the day of the hearing, the new judge ensured that signs were mounted throughout the courthouse complex, including on the original judge's courtroom door, directing people to the correct courtroom for the hearing. Thus, any potential confusion about the location of

37

the hearing caused by the change in the presiding judge was sufficiently addressed, and indeed all three Appellants made it to the right courtroom at the right time for the hearing. Moreover, OCGA § 36-82-76 does not require that the hearing notices identify which individual judge will preside over the hearing. "'If the notice is sufficient to put the individual citizen on notice that the municipality, county, or political division of which he is a resident is seeking to validate bonds, and the time of hearing of the proceeding, the statutory purpose has been subserved.'" Avery, 295 Ga. at 634 (citation omitted). The notice of the hearing in this case was sufficient.

(b) Pellegrino argues next that the Authority did not fulfill its duty under OCGA § 36-82-75 because it failed to show why the stadium project bonds should *not* be validated. When, as required by OCGA § 36-82-74, a government body notifies the appropriate district attorney that it desires to issue revenue bonds, the district attorney must file a petition setting out details of the bonds, including their amount and purpose, in the superior court of the county issuing the bonds. See OCGA § 36-82-75. The court must then issue an order directing the government body that will be issuing the bonds to show cause "why the bonds and the security for the payment thereof should not be

confirmed and validated." Id. Thus, the role of showing why the bonds should not be validated is assigned to the same entity that proposes to issue them.

That is surely an unusual scheme, but the fact that the issuing entity does not argue against validation does not render the proceeding invalid. See <u>Lilly v. Crisp County School System</u>, 117 Ga. App. 868, 869-870 (162 SE2d 456) (1968) (explaining that a bond validation proceeding "was not advisory, collusive or nonjusticiable merely because the defendant [issuing government entity] in its answer admitted the allegations of the petition and offered no showing of cause why the bonds should not be confirmed"). The more significant and realistic protection against improper validation of revenue bonds is provided by the statutory right of any resident of the affected jurisdiction to intervene in the proceedings to present objections and then to appeal the trial court's validation decision. See OCGA § 36-82-77; <u>Greene County Dev. Auth.</u>, 296 Ga. at 726; <u>Nations I</u>, 255 Ga. at 325, 332.[13]

---

[13] OCGA § 36-82-77 says:

> Any citizen of this state who is a resident of the governmental body which desires to issue such bonds may become a party to the proceedings at or before the time set for the hearing and any party thereto who is dissatisfied with the judgment of the court confirming and validating the issuance of the bonds or refusing to confirm and validate the issuance of the bonds and the security therefor may appeal from the judgment under the procedure provided by law in cases of injunction.

Unsurprisingly, the Authority asserts that it did not present any reasons why the bonds should not be issued because it did not have any good reasons. Pellegrino makes no colorable claim that this decision was the result of improper professional conduct by the government's attorneys. Indeed, all of the arguments that he – and the other intervenors – offered against validation of the bonds were considered by the trial court and were held to lack merit, and we have affirmed the rulings challenged on appeal. In sum, the failure of the Authority to oppose the stadium project bonds did not make the validation proceeding improper. [14]

(c)     Pellegrino and Hobgood both argue that the trial court erred during the hearing by refusing to admit into evidence documents and testimony they offered regarding the negotiations between the Braves parties, the County, and the Authority. But the court did not abuse its discretion by excluding this evidence. In a bond validation proceeding, "a trial court must consider whether the proposal to issue those bonds is 'sound, feasible, and reasonable.'" Greene

---

[14] Pellegrino's additional argument that the intervenors were not given copies of the Authority's pleadings is undermined by the transcript of the hearing, which shows that on the day of the hearing, all residents who were granted intervenor status were given copies of the Authority's answer, and no intervenor requested a continuance of the hearing.

County Dev. Auth., 296 Ga. at 726 (citation omitted). Appellants have not shown how the proffered evidence about the negotiations between the government parties and the Braves parties would be relevant to those questions, because the unambiguous financing documents discussed in Division I above are controlling, not the discussions that led up to them. Nor have Appellants shown how the exclusion of this evidence was harmful. See OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . .").

(d) Last, Pellegrino complains that after the hearing, the trial court erred by failing to make specific written findings, even though Hobgood filed a pretrial motion for findings of fact and conclusions of law and reiterated that request at the hearing. Pellegrino, however, did not join in those requests or make a post-judgment motion for such findings, see OCGA § 9-11-52 (c), and he therefore waived review of this complaint. See Cook v. Smith, 288 Ga. 409, 411 (705 SE2d 847) (2010).

In any event, Pellegrino's complaint is meritless. He takes issue with the statement in the court's order overruling "any and all other objections." Beyond that blanket statement, however, the order said: "The Intervenors presented

41

various objections which the Court has consolidated into the following twelve (12) issues addressed in this Section III. The Court fully considered the evidence and testimony the Intervenors presented at the bond hearing." The order then addressed each of those 12 issues, which include all of the substantive objections raised by the three Appellants at the hearing and on appeal here. The trial court's approach was appropriate and sufficient, and Pellegrino fails to identify any objection that got short shrift.

10. In conclusion, after considering as a whole the documents described in Division 1 above, it is evident that the lawyers and officials for Cobb County, the Cobb-Marietta Coliseum and Exhibit Hall Authority, and the Braves parties relied on the prior decisions of this Court interpreting Georgia's Constitution and revenue bond law when structuring the financing for the new Braves stadium project, including in particular the issuance of revenue bonds by the Authority secured in part by an intergovernmental contract with the County. There is nothing wrong with that: local governments, businesses, and individuals are entitled to rely on our precedents, particularly in organizing their contractual and financial affairs. While aspects of the deal structure at issue may push the law about as far as it can go, it does not cross the line into

42

illegality.

In so holding, we do not discount the concerns Appellants have raised about the wisdom of the stadium project and the commitments Cobb County has made to entice the Braves to move there. But those concerns lie predominantly in the realm of public policy entrusted to the County's elected officials for decision, not in the realm of constitutional or statutory law. And to the extent the concerns affect whether the bond proposal is sound, feasible, and reasonable, we defer to the trial court's findings on those factors, which were supported by evidence in the record. Compare <u>Greene County Dev. Auth.</u>, 296 Ga. at 727-728 (affirming the trial court's refusal to validate bonds, where evidence presented at the validation hearing permitted the court to find that the proposal was not sound, feasible, and reasonable). If the stadium deal does not fulfill the high expectations that have been set for it, there may be a significant political price to pay for those who negotiated and signed onto it. But under the law of Georgia as construed in the precedents of this Court, we cannot say that the trial court erred in validating the bonds or that the validation process was deficient. Accordingly, we affirm the trial court's judgment.

<u>Judgment affirmed. All the Justices concur.</u>