309 Ga. 411
FINAL COPY

S20A0328.  FRANZEN et al. v. DOWNTOWN DEVELOPMENT
AUTHORITY OF ATLANTA et al.

MELTON, Chief Justice.

This case involves one of three related bond validation proceedings, all of which concern the redevelopment of an area of downtown Atlanta commonly referred to as "The Gulch."[1] After several days of hearings, the trial court concluded that issuance of the bonds in this case would be sound, feasible, and reasonable. For the reasons set forth below, we affirm.

1. *Background.*

The relevant facts show that, in 1998, the City of Atlanta ("City"), through its City Council, adopted a Westside Redevelopment Plan that expressly declared the City's goal of

---

[1] The two other related bond validation proceedings, which are not considered as part of this opinion, concern the Westside Tax Allocation District, in which The Gulch is located. In those related proceedings, there is a plan to issue "Westside TAD Gulch Area Bonds," which will be secured by an ad valorem tax increment generated within The Gulch.

redeveloping The Gulch, which had been blighted and underdeveloped for some time. This plan states:

> The Railroad Gulch – The ravine created in Atlanta by the railroads has long been a nuisance to the citizens of Atlanta as it has visually, socially, and physically divided the area since the early 1900's. To overcome these conditions[,] the infusion of capital and the assistance of government is needed to redevelop this 150 acre area. . . . With the impending development of the new Atlanta Arena, [Tax Allocation District] funds could be used to help fill development gaps for tourism uses, . . . office and retail uses, and other redevelopment needs and uses that might exist. Such developments offer Atlanta the best opportunity to redevelop the "[G]ulch" since the founding of the city over 150 years ago.

On July 14, 2010, the City designated a certain area which included The Gulch as "Atlanta Urban Redevelopment Area No. 1," pursuant to the Urban Redevelopment Law. See OCGA § 36-61-1 et seq. On November 20, 2017, in order to facilitate redevelopment, the City further designated The Gulch redevelopment area to be an "enterprise zone" under the Enterprise Zone Employment Act. See OCGA § 36-88-1 et seq.[2]

---

[2] The stated purpose of the Enterprise Zone Employment Act is to revitalize areas like The Gulch. OCGA § 36-88-2 provides:

Under the Enterprise Zone Employment Act, a local governing body may designate one or more geographic areas as enterprise zones if they suffer from certain enumerated conditions, such as pervasive poverty, high unemployment, and underdevelopment.[3] In

---

The General Assembly finds and determines that there is a need for revitalization in many areas of Georgia. Revitalization will improve geographic areas within cities and counties which are suffering from disinvestment, underdevelopment, and economic decline and will encourage private businesses to reinvest and rehabilitate such areas. The General Assembly recognizes that increased employment opportunities for the citizens of Georgia will assist in the implementation of welfare reform. It is the intent of the General Assembly that this chapter be liberally construed to accomplish these purposes.

[3] OCGA § 36-88-6 provides:

(a) In order to be designated as an enterprise zone, a nominated area shall meet at least three of the five criteria specified in subsections (b), (c), (d), (e), and (f), or the criteria specified in subsection (g) of this Code section. In determining whether an area suffers from poverty, unemployment, or general distress, the governing body shall use data from the most current United States decennial census and from other information published by the United States Bureau of the Census, the Federal Bureau of Labor Statistics, and the Georgia Department of Labor. In determining whether an area suffers from underdevelopment, the governing body shall use the data specified in subsection (e) of this Code section. The data shall be comparable in point or period of time and methodology employed.

(b) Pervasive poverty shall be evidenced by showing that poverty is widespread throughout the nominated area and shall be established by using the following criteria:

(1) The poverty rate shall be determined from the data in the most current United States decennial census prepared by the

United States Bureau of the Census;

    (2) For parcels within the nominated area, the parcels must be within or adjacent to a census block group where the ratio of income to poverty level for at least 15 percent of the residents shall be less than 1.0;

    (3) Census geographic block groups with no population shall be treated as having a poverty rate which meets the standards of paragraph (2) of this subsection; and

    (4) All parcels of a nominated area must abut and may not contain a noncontiguous parcel, unless such nonabutting parcel qualifies separately under the criteria set forth under paragraph (2) of this subsection.

    (c) Unemployment shall be evidenced by the use of data published by the Office of Labor Information Systems of the Georgia Department of Labor indicating that the average rate of unemployment for the nominated area for the preceding calendar year is at least 10 percent higher than the state average rate of unemployment or by evidence of adverse economic conditions brought about by significant job dislocation within the nominated area such as the closing of a manufacturing plant or federal facility.

    (d) General distress shall be evidenced by adverse conditions within the nominated area other than those of pervasive poverty and unemployment. Examples of such adverse conditions include, but are not limited to, a high incidence of crime, abandoned or dilapidated structures, deteriorated infrastructure, and substantial population decline.

    (e) Underdevelopment shall be evidenced by data indicating development activities, or lack thereof, through land disturbance permits, business license fees, building permits, development fees, or other similar data indicating that the level of development in the nominated area is lower than development activity within the local governing body's jurisdiction.

    (f) General blight within the nominated area shall be evidenced by the inclusion of any portion of the nominated area in an urban redevelopment area as defined by paragraph (20) of Code Section 36-61-2 for which an urban redevelopment plan has been adopted by the affected governing bodies according to the requirements of Chapter 61 of this title.

order to encourage economic development within these blighted enterprise zones, certain qualifying entities — those creating at least five new full-time jobs within the designated enterprise zone

---

(g) (1) A nominated area under this subsection shall:

(A) Be included in an urban redevelopment area as defined by paragraph (23) of Code Section 36-61-2; and

(B) Contain within its borders the site for a redevelopment project having a minimum of $400 million in capital investment for the redevelopment of an area certified by the commissioner to have been chronically underdeveloped for a period of 20 years or more.

(2) Any nominated area meeting the criteria in paragraph (1) of this subsection may be designated as an enterprise zone. Any redevelopment project used to qualify an area for designation as an enterprise zone under this subsection shall, upon approval of such designation, qualify for an exemption of any sales and use tax levied within the boundaries of such project.

(3) Any variation in the sales price of goods and services within any redevelopment project used to qualify an area for designation as an enterprise zone under this subsection attributable to lease arrangements between a retailer and the owner of the project shall be a permitted practice under Parts 1 and 2 of Article 15 of Chapter 1 of Title 10.

(4) By resolution or ordinance, the local governing body designating and creating an enterprise zone under this subsection may assess and collect annual enterprise zone infrastructure fees from each retailer operating within the boundaries of the project in an amount not to exceed, in aggregate, the amount of sales and use tax on transactions of such retailer exempted under paragraph (2) of this subsection, which fees may be pledged by such local governing body, directly or indirectly, as security for revenue bonds issued for development or infrastructure within the enterprise zone.

(5) This subsection shall not apply to projects involving or related to casino gambling.

area — can obtain exemptions from property, occupational, and, in the case of enterprise zones created under OCGA § 36-88-6 (g), sales and use taxes that would otherwise be imposed. See OCGA § 36-88-6 (g) (2). The local governing body that designated the enterprise zone is also authorized, if it chooses to do so, to assess and collect annual enterprise zone infrastructure fees from each qualifying business or entity, in an amount not to exceed the amount of sales and use tax on the exempted transactions. The Enterprise Zone Employment Act expressly authorizes a local governing body to pledge the infrastructure fees as security for revenue bonds issued for development or infrastructure within the enterprise zone. See OCGA § 36-88-6 (g) (4). This combination of exemptions, fees, and bonds enables the redevelopment of these impoverished areas.

Acting within this statutory framework, the City, the Downtown Development Authority of the City of Atlanta ("Development Authority"), and Spring Street, LLC, a private land developer ("Developer"), agreed to enter into an Enterprise Zone Development Agreement ("Development Agreement") to redevelop

The Gulch into an active live/work community.[4] Pursuant to the Development Agreement, the Developer would acquire the land located in The Gulch and then construct the live/work community there in a number of distinct phases. The initial phase requires the Developer, using its own finances, to construct a platform that physically raises The Gulch landscape to the level of surrounding streets. Once this platform is finished, homes and businesses would then be constructed in additional phases.

To partially fund this redevelopment project,[5] the City and the Development Authority, acting as the City's redevelopment agency, established a master financing program, including the proposed

---

[4] The Development Agreement includes programs to create jobs for low-income and unemployed residents, and it includes the construction of affordable housing for residents in order to address the impoverished conditions currently existing in The Gulch.

[5] The operative documents setting forth the financing structure include the Master Indenture of Trust between the Development Authority as the issuer of the bonds and Regions Bank, as trustee; the First Supplemental Indenture of Trust; the EZ Development Agreement between the Development Authority, the City, and the Developer; the Intergovernmental Agreement between the Development Authority and the City; and the Draw-Down Bond Purchase Agreement entered into by the Development Authority, the City, and the Developer, as purchaser of the bonds.

issuance by the Development Authority of the revenue bonds ("Bonds") which are the subject of this case.[6] Because The Gulch has been declared to be an enterprise zone, the City will collect infrastructure fees from the qualifying businesses and service enterprises that will eventually be established within The Gulch. The Bonds, which will be issued to the Developer as an incentive for its construction within The Gulch,[7] will be secured solely by these infrastructure fees.[8] Pursuant to an intergovernmental agreement

---

[6] The Bonds will be issued pursuant to the Downtown Development Authorities Law. See OCGA § 36-42-1 et seq. This statute enables downtown development authorities to issue bonds to finance certain "projects," which are defined as the "acquisition, construction, installation, modification, renovation, or rehabilitation of land, interests in land, buildings, structures, facilities, or other improvements located or to be located within the downtown development area." OCGA § 36-42-3 (6). For this purpose, downtown development authorities may "issue revenue bonds . . . for the purpose of paying, or loaning the proceeds thereof to pay, all or any part of the cost of any project." OCGA § 36-42-8 (a) (7).

[7] The Developer will earn the Bonds with the work it completes within The Gulch, known as "reimbursable project costs." Reimbursable project costs are limited under the operative agreements to "hard, soft, construction management and other costs directly relating to the Project and shall not include any corporate overhead, corporate costs, [or Developer fees or profits] not directly related to the Project . . . , or costs for goods, services or materials that exceed the market cost for similar items in the Metropolitan Atlanta Area as adjusted for all relevant factors."

[8] The same businesses that will be responsible for paying these infrastructure fees will be granted an exemption from paying sales and ad

("IGA") between the City and the Development Authority, the City will collect the infrastructure fees and pass them along to the Development Authority to service any Bonds outstanding at the time.[9] In turn, the Development Authority will turn the fees over to the trustee of the bond account for payment to the Developer.

The timing and the amount of the distribution of the Bonds to the Developer are directly tied to progress in construction of The Gulch and the growth of businesses (and corresponding infrastructure fees) therein.[10] The purpose of the Bonds is to finance

---

valorem taxes.

[9] Under the IGA, the Development Authority is required to cause the Developer to develop The Gulch as provided in the EZ Development Agreement, and the City agrees to pay or cause to be paid to the trustee the net proceeds of the Enterprise Zone Infrastructure Fees collected in The Gulch Enterprise Zone as consideration for the performance of such services in amounts sufficient to pay the principal of, redemption premium (if any) and interest on the Bonds.

[10] Prior to any "draw-down" issuance of the Bonds, the Developer must execute a Funding Notice and Requisition that documents the prior payment of certain costs of construction and development incurred by the Developer. Initially, $100,000 in Bonds will be issued to the Developer at the closing of the bond purchase agreement. The second "draw" or issuance of Bonds to the Developer will not occur unless and until the Developer has incurred $400 million in reimbursable project costs, the initial phase of the project is significantly developed, and certain other conditions are satisfied, including receipt of the feasibility consultant's report confirming sufficient projected infrastructure fee revenues to satisfy debt service of the Bonds. Similar

a portion of the costs associated with The Gulch Project, largely beginning *after* the Developer expends $400 million of *its own funds* in starting the redevelopment project.[11] The Bonds will be paid off *solely* from infrastructure fees collected within The Gulch through 2048, or when the Bonds are fully paid off, whichever occurs sooner.

The operative documents creating the financing structure clearly and unequivocally state that neither the City nor the Development Authority will have any obligation whatsoever to pay for the Bonds other than by transferring the infrastructure fees that have been collected. And, the Developer is given rights to pursue infrastructure fees only, not any other funds whatsoever. If infrastructure fees are ultimately insufficient to cover the debt created by the Bonds, the Developer has *no recourse* for the resulting loss against any of the government parties. In other words, if an insufficient amount of infrastructure fees is generated to support the

---

requirements and revenue projection safeguards apply to any and all subsequent draw-down of Bonds.

[11] Testimony at the bond validation hearings indicated that the Bonds were necessary to incentivize this outlay of funds to raise The Gulch.

debt service on the Bonds at any given time, the entirety of the shortfall must simply be borne by the Developer as a loss.[12]

In addition to information from the Developer regarding development and construction benchmarks prior to the issuance of Bonds, other prerequisites will be in place to ensure that future incremental issuances of Bonds will be well secured. Prior to each such draw-down issuance, the Development Authority must receive a report from a feasibility consultant confirming that the maximum annual forecasted net infrastructure fees will equal *at least 110 percent* of the maximum annual debt service for all outstanding

---

[12] The Master Indenture of Trust provides:

No owner or owners of the Bonds shall ever have the right to compel any exercise of the taxing power of the Issuer, the City, the County, the State or any political subdivision thereof to pay the Bonds, or the interest thereon, or to enforce payment of the Bonds, against any property of the Issuer, the City, the County, the State or any political subdivision thereof, and the Bonds shall not constitute a charge, lien, or encumbrance, legal or equitable, upon any property of the Issuer, the City, the County, the State or any political subdivision thereof except the Trust Estate and any other funds pledged to secure the Bonds. The Bonds shall not constitute a debt of the Issuer, the City, the County, or any other political subdivision of the State within the meaning of any constitutional or statutory limitation upon indebtedness, including, but not limited to, Article IX, Section V of the Georgia Constitution.

Bonds at the given time. In this manner, there is assurance that the bond issuance will remain financially sound and reasonable throughout the course of The Gulch's redevelopment.

Ultimately, the Development Authority seeks to validate up to a maximum amount of $1,250,000,000 in Bonds, but the Bonds will be issued incrementally as the specified conditions above are satisfied. It is possible that a lower amount of Bonds will eventually be issued.[13]

To summarize in the simplest manner: (1) the Development Authority will issue revenue bonds in incremental amounts tied to

---

[13] In technical detail, the Developer will receive a "first draw" of $100,000 in Bonds at closing. A second draw in the amount of $375 million will occur only if the Developer demonstrates, by means of a Funding Notice and Requisition, that it has incurred $400 million in reimbursable project costs relating to construction of the project. If such costs are then verified as proper by the Development Authority, $375 million of Bonds will be issued— provided that a feasibility consultant's report demonstrates the availability of sufficient security for that draw-down, meaning excess projected enterprise zone infrastructure fees to pay debt service on the Bonds by satisfying a predetermined "coverage test" (110% of the maximum annual debt service during a particular forecasted period of time). Each subsequent Bond draw, if any, is subject to the same financial safeguards and restrictions, plus proof that 500,000 square feet of "Vertical Development" has been completed prior to each draw. Moreover, the Developer can be reimbursed after the second draw only to the extent of 20% of its reimbursable project costs (reflecting the fact that the Bond issuance is intended only as partial reimbursement of the overall project costs).

progress in redevelopment of The Gulch enterprise zone; (2) the revenue bonds will be available only to the Developer, who will earn the bonds with development and construction work completed within The Gulch using the Developer's own money; (3) the debt service for the bonds will be funded exclusively by infrastructure fees; (4) the City will collect these infrastructure fees from businesses within The Gulch and pass them along to the Development Authority for payment of the bonds; and (5) the Developer has certain strictly limited rights to enforce the transfer of collected infrastructure fees, but has no right whatsoever to any other funds of the public entities involved in The Gulch Project.

2. *The Bond Validation Proceeding.*

On November 21, 2018, a bond validation hearing regarding the Bonds was set for December 10, 2018.[14] On the morning of the

---

[14] Previously, on November 8, 2018, the Development Authority adopted a bond resolution authorizing, among other things, the issuance of the Enterprise Zone Bonds. On November 21, 2018, the Development Authority provided the District Attorney of the Atlanta Judicial Circuit with notice of its intent to issue the Enterprise Zone Bonds. On that same day, the State of Georgia, through the District Attorney, filed a petition for validation of the

hearing, four citizens of the City ("Intervenors"), who are the appellants in the present case, moved to intervene.[15] See OCGA § 36-82-77 (a). At the same time, the Intervenors filed an answer to the Development Authority's petition for validation. The Intervenors' filing contained nine objections.

At the bond validation hearing, the Development Authority and the City presented their opening evidence, including the Bond documents described above and descriptions of the Bond mechanics. The Intervenors then testified to prove their residence within the City. At that time, the trial court expressed its intent to allow the Intervenors and the Developer, which had also filed a motion, to intervene. On the following day, December 11, the trial court followed up its oral ruling by signing a written order allowing intervention of the Intervenors.

---

Bonds, reciting that the principal amount would not exceed $1.25 billion, the maximum annual principal and interest payment would not exceed a certain calculable amount, and the final maturity date of the Bonds would not be later than December 1, 2048.

[15] The intervenors are Timothy Franzen, Vincent D. Fort, James S. Martin, and Julian M. Bene.

On December 19, the bond validation hearing continued. The trial court received additional evidence that day regarding the proposed validation and the Intervenors' objections. Because of the voluminous nature of the filings and the evidence presented, the trial court continued the hearing one more time until December 21. That day, all parties returned, and the trial court received even more evidence. Following this final day of the bond validation hearing, and after considering everything that had been *timely* presented up to that point, the trial court issued two written orders: one rejecting the Intervenors' objections on June 21, 2019, and one validating issuance of the Bonds on July 3, 2019. These two rulings form the crux of this appeal.

3. *Rulings on Objections Timely Raised by the Intervenors.*[16]

(a) Citing OCGA § 36-82-77 (a), the Intervenors first contend that the trial court erred by failing to hold a wholly separate hearing

---

[16] In their appellate briefs, the Intervenors intertwine objections that were raised in and ruled upon by the trial court with numerous objections that were not. We address only those objections considered timely by the trial court, as more fully discussed in Division 3 (b).

for the purpose of considering their nine timely objections to the bond validation petition. We disagree.

In relevant part, OCGA § 36-82-77 (a) provides: "Within the time prescribed in the order or such further time as he may fix, the judge of the superior court shall proceed to hear and determine all questions of law and of fact in the case and shall render judgment thereof." The Intervenors wish to read into this mandate an obligation for a separate hearing on their objections, but no such obligation exists.

The record shows that a three-day validation hearing was held in this case, and the trial court consistently informed the Intervenors that, during these hearings, they could present any evidence they wished. The Intervenors were not prevented from making any arguments during the hearings. At the end of the final day of the validation hearing, the trial court noted that it was "saturated . . . with information" and asked each party for input on whether they would like to (i) schedule oral argument for a later date, (ii) rest on the current pleadings, or (iii) submit additional

written argument. The Intervenors indicated that they preferred additional oral argument. The trial court then announced that it would consider the entire record and decide whether it felt comfortable ruling on the record and the pleadings, "without oral argument or further briefing." The Intervenors did not object. The trial court later  entered the two orders at issue in this appeal without additional argument or briefing.

Given the extensive hearings held by the trial court, the Intervenors' contention that the trial court's consideration of their arguments was inadequate is belied by the record. The trial court gave extensive consideration to all of the pertinent issues. Moreover, even if there were any basis for the Intervenors' contentions, of which we have found none, the Intervenors have identified no argument raised in their original filing of nine objections, either here or below, that was not fully considered by the trial court. There was no error.

(b) The Intervenors next argue that the trial court erred in its determination that additional objections to the bond validation filed

by them after the first full day of hearings on December 10, were untimely.[17] Specifically, the Intervenors contend that they did not become parties to the bond validation proceedings until the trial court signed a written intervention order on the day *after* the first hearing (December 11). They argue that the trial, therefore, could not have begun on December 10, and they had the right to file additional objections to the petition for validation prior to December 19, the date that the hearing on the bond validation resumed. There is no merit to this argument.

In general, citizens seeking to intervene in a bond validation proceeding under OCGA § 36-82-77 (a) must file a motion to intervene under OCGA § 9-11-24, as Georgia's Civil Practice Act applies to bond validation proceedings and dictates the procedure by which a private citizen may become a party to such an action. See *Sherman v. Dev. Auth. of Fulton County*, 321 Ga. App. 550 (1) (739

---

[17] On December 14, the Intervenors filed an amendment to their original answer which included 12 additional objections. At the conclusion of the validation hearing on December 21, the Intervenors filed a motion to file two additional objections, for a total of 23 objections.

SE2d 457) (2013). There is no contention in this case that the Intervenors failed to take any of the required steps to intervene. To the contrary, the City and the Development Authority have recognized the Intervenors' statutory right to intervene from the outset of the initial hearing.[18]

Here, the record supports the trial court's findings that the Intervenors were full participants in this case from the outset of the December 10 hearing and were allowed to intervene in the bond validation proceeding at that time. The trial court found that "[t]he citizen intervenors were allowed to join in and their initial answer and objections were accepted as timely" at the December 10 hearing. The hearing transcript supports this finding, as the trial court unequivocally treated the Intervenors as parties and allowed them to testify and enter evidence.[19]

---

[18] In fact, the City and the Development Authority immediately offered to stipulate to the standing of the Intervenors.

[19] The trial court even expressed an uncertainty that it might have already signed an order, asking: "Okay. Mr. Pryor [counsel for the Intervenors], do I have before me an order to sign *or did I already sign an order* granting your motion to intervene?" (Emphasis supplied.)

Because the Intervenors were allowed to intervene at the first bond validation hearing on December 10, the Intervenors could only amend their pleadings after that date to add objections if granted leave to do so by the trial court. See OCGA § 9-11-15 (a);[20] *Borenstein v. Blumenfeld*, 250 Ga. 606, 607 (1) (299 SE2d 727) (1983) (after the commencement of the trial and the taking of evidence, a party may amend his pleading only by leave of court or by written consent of the adverse party). Therefore, at the time that the Intervenors attempted to amend their pleadings to raise additional objections, the trial court was authorized to allow or disallow any such amendments at its discretion.

Here, the trial court found that the Intervenors' amendments were untimely, and did not allow them to be filed. This was not an abuse of the trial court's broad discretion. See, e.g., *Ford's & Gantt Co., Inc. v. Wallace*, 249 Ga. App. 273, 276 (548 SE2d 231) (2001)

---

[20] OCGA § 9-11-15 (a) provides:
A party may amend his pleading as a matter of course and without leave of court at any time before the entry of a pretrial order. Thereafter the party may amend his pleading only by leave of court or by written consent of the adverse party. . . .

(trial court did not abuse discretion denying amendment where "the attempt to amend the answer to add the defense of condemnation came too late and was not supported by the evidence"); *Kim v. McCullom*, 222 Ga. App. 439, 440 (2) (474 SE2d 654) (1996) ("Not only is the right of amendment very broad, but so is the court's discretion in this regard, and its determination will not be disturbed absent abuse." (citation and punctuation omitted)). As the trial court found in its order regarding the Intervenors' objections, the Intervenors were not surprised by the filing of the bond validation petitions and had sufficient time to prepare, evidenced by the Intervenors' timely 30-page answer and objections. In addition, one of the Intervenors acknowledged during his testimony that the Intervenors had been consulting with counsel since October 2018.

Citing cases such as *Tyree v. Jackson*, 226 Ga. 690, 694 (2) (177 SE2d 160) (1970), and *Titelman v. Stedman*, 277 Ga. 460, 461 (591 SE2d 774) (2003), the Intervenors nonetheless contend that they could not have become parties and the trial could not have begun until the trial court entered a *written* order granting their

intervention. The cases cited by the Intervenors, however, regard the entry of a binding *judgment*, not a decision regarding a procedural issue such as intervention. With regard to such a procedural issue, "if a judge's ruling made in open court is clearly intended to take effect immediately, it is effective against the litigants immediately, not only when it is reduced to a written order." *Mondy v. Magnolia Advanced Materials, Inc.*, 303 Ga. 764, 774 (815 SE2d 70) (2018). There was no error.

(c) The Intervenors next contend that the trial court failed to make legally adequate findings of fact and conclusions of law as to whether the bond proposal and its corresponding security provided by infrastructure fees are sound, feasible, and reasonable. See OCGA § 9-11-52 (a).[21] In its order validating the issuance of the

---

[21] This statute provides:
In ruling on interlocutory injunctions and in all nonjury trials in courts of record, the court shall upon request of any party made prior to such ruling, find the facts specially and shall state separately its conclusions of law. If an opinion or memorandum of decision is filed, it will be sufficient if the findings and conclusions appear therein. Findings shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

Bonds, the trial court concluded, after other lengthy recitations:

> IT IS FURTHER DECLARED, ORDERED, AND ADJUDGED, as a matter of fact and law, that both the issuance of the EZ Bonds and the security therefor, are sound, feasible and reasonable, as demonstrated by the evidence adduced at the hearing, including the fact that the bonds will be issued only upon proof of work completed and expenditures made[.]

Isolating this single paragraph from the rest of the trial court's lengthy order, the Intervenors argue that there are insufficient findings of fact and law to support the trial court's conclusions. In making this argument, the Intervenors rely heavily on *Sherman v. Dev. Auth. of Fulton County*, 320 Ga. App. 689, 693 (1) (740 SE2d 663) (2013) (*Sherman III*). In that bond validation proceeding, the Court of Appeals held that the trial court's findings were too incomplete for adequate review and remanded the case, explaining:

> [T]he trial court labeled some of its holdings as "findings of fact." Instead of being actual factual findings, however, these statements are summary conclusions that *contain no hint about the evidence or analysis* the court relied on to arrive at them. Similarly, the trial court's "conclusions of law" challenged by Sherman on this appeal cite no legal authority and contain no analysis that explains them.

(Emphasis supplied.) Id. The present case, however, is quite

different from *Sherman III.* Here, after lengthy hearings, the trial court entered two orders setting forth extensive findings and conclusions. This is not a situation in which there is "no hint about the evidence or analysis the [trial] court relied on." Id. To the contrary, even in the trial court's isolated conclusion cited above, the court expressly explained that it relied on "evidence adduced at the hearing, including the fact that the bonds will be issued only upon proof of work completed and expenditures made[.]" And, during the three days of hearings, extensive evidence was, in fact, presented regarding the mechanics of the bond financing structure, which is included in the record and discussed in the trial court's lengthy orders. Therefore, contrary to the Intervenors' contentions, there is a clear statement of the trial court's reasoning, and there is a sufficient basis on which this Court can assess that conclusion. See *Greene County Dev. Auth. v. State of Ga.*, 296 Ga. 725 (770 SE2d 595) (2015). See also *Savage v. State of Ga.*, 297 Ga. 627, 647 (9) (d) (774 SE2d 624) (2015). Therefore, there is no need to remand this case for the trial court to make additional findings.

(d) Citing Article IX, Section II, Paragraph VII (c) of the Georgia Constitution of 1983,[22] the Intervenors maintain that the trial court incorrectly held that the intergovernmental agreement between the City and the Development Authority is lawful. Specifically, the Intervenors contend that the City lacks the authority to perform its obligations under the IGA.[23] We disagree.

---

[22] This constitutional provision states:

The General Assembly is authorized to provide by general law for the creation of enterprise zones by counties or municipalities, or both. Such law may provide for exemptions, credits, or reductions of any tax or taxes levied within such zones by the state, a county, a municipality, or any combination thereof. Such exemptions shall be available only to such persons, firms, or corporations which create job opportunities within the enterprise zone for unemployed, low, and moderate income persons in accordance with the standards set forth in such general law. Such general law shall further define enterprise zones so as to limit such tax exemptions, credits, or reductions to persons and geographic areas which are determined to be underdeveloped as evidenced by the unemployment rate and the average personal income in the area when compared to the remainder of the state. The General Assembly may by general law further define areas qualified for creation of enterprise zones and may provide for all matters relative to the creation, approval, and termination of such zones.

[23] We note that the Intervenors do not challenge the general authority of the Development Authority to issue bonds under the IGA. OCGA § 36-42-8 authorizes issuance of revenue bonds for the purpose of financing the cost of any "project," and empowers the Development Authority to exercise any power granted by the laws of the State to public or private corporations not in conflict with the public purposes specified in the Downtown Development Authorities Law. The Gulch Project meets the definition of a "project" under the Downtown

The Georgia Constitution establishes four requirements for intergovernmental agreements. Article IX, Section III, Paragraph I (a) of the Georgia Constitution of 1983 provides:

> The state, or any institution, department, or other agency thereof, and any county, municipality, school district, or other political subdivision of the state may contract for any period not exceeding 50 years with each other or with any other public agency, public corporation, or public authority for joint services, for the provision of services, or for the joint or separate use of facilities or equipment; but such contracts must deal with activities, services, or facilities which the contracting parties are authorized by law to undertake or provide. By way of specific instance and not limitation, a mutual undertaking by a local government entity to borrow and an undertaking by the state or a state authority to lend funds from and to one another for water or sewerage facilities or systems or for regional or multijurisdictional solid waste recycling or solid waste facilities or systems pursuant to law shall be a provision for services and an activity within the meaning of this Paragraph.

Therefore, to qualify as a valid intergovernmental contract, an agreement must: (1) be a contract between political subdivisions of the state; (2) not last for more than 50 years; (3) be "for joint services,

---

Development Authorities Law. In addition, the Redevelopment Powers Law, OCGA § 36-44-1 et seq., authorizes the City and the Development Authority, as its agent, in partnership with private enterprise, to cause designated redevelopment areas to be redeveloped. See OCGA §§ 36-44-2 and 36-44-5.

for the provision of services, or for the joint or separate use of facilities or equipment"; and (4) "deal with activities, services, or facilities which the contracting parties are authorized by law to undertake or provide."[24]

On its face, the IGA satisfies the first three requirements, and the Intervenors argue only that the fourth requirement is not satisfied here, contending that the City is not authorized to assess infrastructure fees and provide them as payment for the Bonds.[25] This argument, however, is misguided, as revealed by a consideration of the statutory authority for the City's actions.

For purposes of redevelopment, the Redevelopment Powers Law and the Enterprise Zone Employment Act function in tandem under the circumstances in this case. Under the Redevelopment Powers Law, OCGA § 36-44-1 et seq., the City and/or the Development Authority may designate redevelopment areas to be redeveloped in partnership with private enterprises, as has been

[24] These services are detailed in Sections 3.1 and 3.2 of the IGA.
[25] The Intervenors do not claim that the City is not providing services, only that the City lacks authority to provide those services.

done here. In addition, pursuant to OCGA § 36-88-6 (g) (1) of the Enterprise Zone Employment Act, the City may nominate such an area as an enterprise zone for these redevelopment purposes. The City followed this process with The Gulch, finding that, in fact, it was an area in urgent need of redevelopment and declaring it, pursuant to a valid City ordinance, to be an enterprise zone. Under the Enterprise Zone Employment Act, in turn, the City is then empowered to assess and collect enterprise zone infrastructure fees and to pledge such funds for revenue bonds issued for development and infrastructure within the designated enterprise zone. OCGA § 36-88-6 (g) (4) explicitly provides:

> By resolution or ordinance, the local governing body designating and creating an enterprise zone under this subsection *may assess and collect annual enterprise zone infrastructure fees* from each retailer operating within the boundaries of the project in an amount not to exceed, in aggregate, the amount of sales and use tax on transactions of such retailer exempted under paragraph (2) of this subsection, *which fees may be pledged* by such local governing body, directly or indirectly, *as security for revenue bonds issued for development or infrastructure* within the enterprise zone.

The Enterprise Zone Employment Act does not define "development

or infrastructure," but the Intervenors do not contend that the work intended to be completed in The Gulch would not qualify as "development or infrastructure." And, giving those terms their ordinary meaning, see *City of College Park v. Martin*, 304 Ga. 488, 489 (818 SE2d 620) (2018), the work of building a work/live community in the blighted area of The Gulch would certainly qualify as development or infrastructure. Accordingly, the funding of The Gulch Project that utilizes infrastructure fees and the issuance of Bonds is legally authorized.

The Intervenors attempt to undercut the City's authority with two main arguments: (1) that the 2017 Amendment[26] to the

---

[26] In 2017, the General Assembly passed an amendment to the Enterprise Zone Employment Act. In the amendment, the General Assembly established an additional basis by which a local government may designate an enterprise zone. Such an area must: (1) be included in an urban redevelopment area as defined by OCGA § 36-61-2 (23) and (2) contain a redevelopment site having a minimum $400 million capital investment project for redevelopment of an area certified as "chronically underdeveloped for a period of 20 years or more." OCGA § 36-88-6 (g) (1) (A)-(B). The 2017 Amendment allowed an area meeting these two criteria to be designated an enterprise zone, and the redevelopment project used to qualify the area for designation as an enterprise zone shall "qualify for an exemption of any sales and use tax levied within the boundaries" of the project. OCGA § 36-88-6 (g) (2).

Enterprise Zone Act is improperly contradictory to other sections of the same Act, and (2) that infrastructure fees cannot, under any circumstances, be utilized to fund private development.[27]

With regard to the first contention, the Intervenors contend that it is improper for the Enterprise Zone Employment Act to allow qualifying businesses an exemption from certain taxes in paragraph (g) (2) of OCGA § 36-88-6 but then impose an infrastructure fee under paragraph (g) (4) of the statute. In essence, the Intervenors argue that the 2017 Amendment, which governs the IGA, contradicts the version of the statute that existed prior to the amendment.[28] But the Intervenors ignore the fact that statutory amendments, by their very nature, represent a *change* to the prior law. The Intervenors have provided no authority, and we know of none, that would prevent the General Assembly from amending the

---

[27] The Intervenors also attempt to attack the infrastructure fees on a number of other constitutional bases not considered by the trial court below. This Court does not reach the constitutionality of a statute unless it clearly appears in the record that the constitutional issue was *directly and properly* raised in the trial court and distinctly ruled on by the trial judge. See, e.g., *In the Interest of J. R. R.*, 281 Ga. 662–663 (641 SE2d 526) (2007).

[28] The Intervenors characterize the 2017 Amendment as "twisting" the original intent of the earlier version.

Enterprise Zone Employment Act in the way it did in 2017. While the Intervenors may disagree with the amendment, that does not affect the authority of the General Assembly to enact it. And the amendment does not affect the enforceability of the Enterprise Zone Employment Act, *as amended*.

With regard to their second contention, the Intervenors argue that, because The Gulch is going to be a privately owned project constructed by the Developer, infrastructure fees cannot be used to fund bonds that contribute to such private development. In making this argument, the Intervenors appear to be rewriting the authority given in OCGA § 36-88-6 (g) (4), interpreting the statute as mandating that infrastructure fees may be used as security for revenue bonds issued for only purely *public* development or infrastructure within the enterprise zone. The statute contains no such limitation to "development or infrastructure," and there is no indication that the General Assembly meant for the statute to be

used to fund only public projects.[29] To the contrary, the General

Assembly has expressed a general intent that the exercise of

redevelopment powers may involve partnering with private parties.

For example, OCGA § 36-44-2 of the Redevelopment Powers Law

provides:

> It is found and declared that economically and socially
> depressed areas exist within counties and municipalities
> of this state and that these areas contribute to or cause
> unemployment, limit the tax resources of counties and
> municipalities, and create a greater demand for
> governmental services and, in general, have a deleterious
> effect upon the public health, safety, morals, and welfare.
> It is, therefore, in the public interest that such areas be
> redeveloped to the maximum extent practicable to
> improve economic and social conditions therein in order
> to abate or eliminate such deleterious effects. To
> encourage such redevelopment, it is essential that the
> counties and municipalities of this state have additional
> powers *to form a more effective partnership with private
> enterprise* to overcome economic limitations that have
> previously impeded or prohibited redevelopment of such
> areas. It is the purpose of this chapter, therefore, to grant
> such additional powers to the counties and municipalities
> of this state, and it is the intention of the General
> Assembly that this chapter be liberally construed to carry
> out such purpose.

---

[29] We note that the Intervenors also raise challenges pursuant to the Georgia Constitution's Lending Clause and Gratuities Clause. These contentions were part of the objections untimely raised in the trial court and will not be considered here.

(Emphasis supplied.) Furthermore, our own opinions have recognized the importance of public and private partnerships for the purpose of redevelopment. See *Savage*, supra, 297 Ga. at 636 (4) (c) (affirming the validation of bonds issued to construct the new stadium for the Atlanta Braves in Cobb County).

In an additional corollary argument, the Intervenors contend that, because the Developer is given certain limited rights to ensure that it receives collected infrastructure fees, all authority of the governmental entities to enter the IGA is invalid. Section 8.9 of the IGA provides: "The Bondholders are third-party beneficiaries of this Intergovernmental Agreement, and may enforce the terms and provisions hereof." But, it is well established in Georgia law that governmental entities may contract with private entities to provide public services. See, e.g., *Strykr v. Long County Bd. of Commrs.*, 277 Ga. 624, 626 (593 SE2d 348) (2004). See also *Smith v. Bd. of Commrs. of Roads & Revenues of Hall County*, 244 Ga. 133, 141 (259 SE2d 74) (1979) ("The fact that the private contractor is paid for its

services and may make a profit under such a contract does not invalidate the contract provided the county or its residents receive the services required."). Moreover, we have already held in a similar case that, in appropriate circumstances, public bonds may be issued to fund the construction of private developments which provide a public benefit. See *Savage,* supra, 297 Ga. at 636 (4) (c). The public entities involved in The Gulch project have determined that a considerable public benefit will be generated by redevelopment of The Gulch, as an area that has been blighted for decades will finally be resurrected for the benefit of the public at large. This Court has no authority to second guess that policy decision. See id. at 647 (10).

The trial court did not err in its determination that the IGA is a valid agreement between the City and the Development Authority.

(e) In the proceedings below, the Intervenors contended that the imposition of infrastructure fees under the Enterprise Zone Employment Act violated Article IX, Section II, Paragraph VII (c)[30]

---

[30] This provision states:
The General Assembly is authorized to provide by general law for

of the Georgia Constitution, the "Community Redevelopment Provision."[31] The Intervenors maintained that a municipality may be authorized to levy infrastructure fees only pursuant to that provision, which authorizes the General Assembly to enact general laws allowing the creation of enterprise zones and tax exemptions therein for certain qualifying businesses.

The trial court rejected this argument, finding that the Community Redevelopment Provision was not an exclusive grant of

---

the creation of enterprise zones by counties or municipalities, or both. Such law may provide for exemptions, credits, or reductions of any tax or taxes levied within such zones by the state, a county, a municipality, or any combination thereof. Such exemptions shall be available only to such persons, firms, or corporations which create job opportunities within the enterprise zone for unemployed, low, and moderate income persons in accordance with the standards set forth in such general law. Such general law shall further define enterprise zones so as to limit such tax exemptions, credits, or reductions to persons and geographic areas which are determined to be underdeveloped as evidenced by the unemployment rate and the average personal income in the area when compared to the remainder of the state. The General Assembly may by general law further define areas qualified for creation of enterprise zones and may provide for all matters relative to the creation, approval, and termination of such zones.

[31] In their brief, the Intervenors spend a great deal of space advancing arguments related to this issue that were deemed untimely by the trial court. As noted earlier, we do not reach these arguments.

legislative authority. To the contrary, the trial court recognized that the General Assembly has the power to authorize municipalities to levy fees under Article III, Section VI, Paragraph I, which gives the legislature "the power to make all laws not inconsistent with this Constitution . . . which it shall deem necessary and proper for the welfare of the state."[32] The trial court further held that nothing in the Community Redevelopment Provision in any way prohibits, precludes, or limits the exercise of such powers. Thus, the Intervenors failed to show a "clear and palpable" conflict between the statute and the Constitution, as would be required to overcome the presumption that there was a proper exercise of plenary legislative power. See *Dev. Auth. of DeKalb County v. State of Ga.*, 286 Ga. 36, 38 (1) (684 SE2d 856) (2009).

The Intervenors nonetheless contend that OCGA § 36-88-6 (g) (4) exceeds the authority vested in the General Assembly by the

---

[32] The provision states in full:
The General Assembly shall have the power to make all laws not inconsistent with this Constitution, and not repugnant to the Constitution of the United States, which it shall deem necessary and proper for the welfare of the state.

Community Redevelopment Provision because the constitutional provision dealing with the general creation of enterprise zones never mentions the imposition of "fees." As shown above, Article III, Section VI, Paragraph I provides all the needed authority for the General Assembly to enact OCGA § 36-88-6 (g) (4), and the statute does not contravene the Community Redevelopment Provision.

(f) The Intervenors next contend that the 2017 Enterprise Zone Amendment is unconstitutional because it allows an "area-wide tax exemption" that exceeds the authority granted in the Community Redevelopment Provision. Essentially, the Intervenors appear to be arguing that the 2017 Amendment completely omits the requirement that exemptions be tied to qualifying businesses and service enterprises. This is wrong.

The Community Redevelopment Provision, Article IX, Section II, Paragraph VII (c) of the 1983 Georgia Constitution, authorizes the General Assembly to provide for the creation of enterprise zones allowing for "exemptions, credits, or reductions of any tax or taxes levied within such zones by the state, a county, [or] a municipality."

These exemptions may be given to "such persons, firms, or corporations which create job opportunities within the enterprise zone for unemployed, low, and moderate income persons in accordance with the standards set forth in such general law." Id.

Pursuant to this constitutional grant of authority, the General Assembly passed the Enterprise Zone Employment Act of 1997. OCGA § 36-88-1 et seq. OCGA § 36-88-4 (a) allows the use of "incentives [to be made] available to qualifying business and service enterprises to encourage revitalization within enterprise zones." In turn, a "qualifying business or service enterprise" is an organization that increases employment by five or more full-time job equivalents in the designated area. Id. In addition, to the extent that it is feasible, "10 percent of such new employees shall be low-income or moderate-income individuals." OCGA § 36-88-4 (b).

The 2017 Amendment continues to limit tax incentives to "qualifying business and service enterprises" within enterprise zones. OCGA § 36-88-4 (a) lists three "enterprise zone" incentives that are available to qualifying enterprises. It provides:

The following incentives are available to qualifying business and service enterprises to encourage revitalization within enterprise zones: (1) The enterprise zone property tax exemption provided in Code Section 36-88-8; (2) The occupational tax, regulatory fee, and business inspection fee abatement or reduction provided in Code Section 36-88-9; and (3) For enterprise zones created pursuant to subsection (g) of Code Section 36-88-6, the sales and use tax exemption provided in such subsection pursuant to the authority granted by Article IX, Section II, Paragraph VII (c) of the Constitution of Georgia.

The 2017 Amendment added the third category, which expressly references both enterprise zones created pursuant to OCGA § 36-88-6 (g) and Article IX, Section II, Paragraph VII (c). The plain language of the statute limits the third incentive category, like the first two categories, to qualifying entities, such as The Gulch enterprise zone and the qualifying enterprises contained therein. In amending the Act's "qualifying business" section cited directly above, the General Assembly expressed its intent for OCGA § 36-88-6 (g) enterprise zones (such as The Gulch) to remain subject to the "qualifying business" requirement in OCGA § 36-88-4. Both the area and the enterprises within the area must "qualify," leaving the

enactment consistent with the Community Redevelopment Provision.

Nonetheless, the Intervenors argue that the City and the Development Authority intend to *apply* the Enterprise Zone Employment Act in an unconstitutional way by extending exemptions to any and all retailers within The Gulch, irrespective of whether they are qualifying enterprises. But this claim is not supported by the record. The ordinance enacted by the City declaring The Gulch to be an enterprise zone *explicitly* limits the sales and use tax exemption to be "in accordance with OCGA § 36-88-6 (g) and OCGA § 36-88-3 (8.1)." As such, the ordinance is limited to "qualifying" entities as envisioned by the Community Redevelopment Provision. This also supports the trial court's clear holding that the sales and use tax exemption and corresponding infrastructure fees authorized by the 2017 EZ Ordinance apply only to qualifying businesses and service enterprises that create at least five full-time jobs. Again, there was no error.

(g) The Intervenors argue that the bond issuance is not sound,

feasible, and reasonable because projected infrastructure fee revenues are inadequate to secure Bonds in an amount of $1.25 billion. This argument, however, does not account for the incremental nature of the financing scheme, and therefore lacks merit.

"[W]hether a proposal to issue bonds is sound, feasible, and reasonable is a question for the trial court, and its findings about soundness, feasibility, and reasonableness must be sustained on appeal if there is any evidence to support them." *Greene County Dev. Auth.*, supra, 296 Ga. at 726. To validate the bond proposal in this case, the trial court was not required to find that $633 million of infrastructure fees over a 30-year period, as conservatively projected by the Development Authority's experts, would service bonds in the *possible* principal amount of $1.25 billion. The Bonds are "draw-down" bonds that will be issued *only if* sufficient infrastructure fees are projected to service the bonds. So, if only $633 million of infrastructure fees are projected to be generated by The Gulch, only an amount of Bonds that may be adequately serviced by that amount

of fees will be issued.

David Saikia of MuniCap, Inc., a national economic feasibility consulting firm, testified extensively about potential retail development and infrastructure fee projections within The Gulch.[33] In addition, Ralph Dickerson, a senior official in the City of Atlanta Department of Finance, testified about the structure of the bond proposal. As discussed in Division 1 above, the bond proposal calls for the issuance of Bonds to the Developer incrementally in the *maximum* aggregate principal amount of up to $1,250,000,000, *assuming* that The Gulch Project is fully developed to 12 million square feet at an approximate total cost of at least $5 billion and that numerous conditions to issuance are also satisfied. The safeguards built into the draw-down structure of the bond proposal ensure that Bonds will not be issued unless the Developer has first completed construction work, the Development Authority has

---

[33] The MuniCap report contained projections intended to "provide a baseline understanding of the potential of this transaction from a revenue perspective." It was "absolutely not" designed to set a cap on the amount of infrastructure fees that *might* be generated.

confirmed the expenditures, and a feasibility consultant has issued a report concluding that projected infrastructure fees provide sufficient debt service coverage for whatever amount of Bonds are to be issued.[34]

So, the Intervenors' argument that $633 million in infrastructure fees cannot support $1.25 billion in Bonds is based on an incorrect premise, namely that it is possible for $1.25 billion in Bonds to be issued if only $633 million of infrastructure fees are projected. After considering all of the testimony and evidence, the trial court recognized in its ruling on the soundness, feasibility, and reasonableness of the Bonds that the draw-down nature of the bond financing structure mandates that an appropriate amount of infrastructure fees must be projected before a corresponding amount of Bonds will be issued. There will not be, as the Intervenors contend, an immediate issuance of $1.25 billion in Bonds in the hopes that infrastructure fees catch up. For this reason, the

---

[34] It is clear from the trial court's orders that, as the finder of fact, it credited this testimony.

Intervenors' objection in this regard is meritless.

(h) Finally, in a duplicative argument, the Intervenors generally contend that the trial court erred by finding the bond issuance to be sound, feasible, and reasonable.[35] As set forth in the prior subdivision, the trial court's findings on this issue must be affirmed if there is any evidence to support them. And the evidence, which has been previously set forth and discussed, is ample.

4. *Conclusion.*

The record supports the trial court's decision to defer to the City's view that redevelopment of The Gulch serves a beneficial public purpose. While not all Atlantans, including the Intervenors in this case, share the City's vision for The Gulch, that does not mean that the project is illegal. As the trial court pointed out, the job of the courts is not to question the advisability or estimate the popularity of the City's decisions regarding the development of The Gulch. With regard to the validation of the Bonds, the job of this

---

[35] The sound, feasible, and reasonable requirement arises not from the text of the Revenue Bond Law, but case law. See, e.g., *Carter v. State of Ga.*, 93 Ga. App. 12, 19-21 (90 SE2d 672) (1955).

Court is simply to determine whether there was any evidence supporting the trial court's determination that the issuance of the Bonds was sound, feasible, and reasonable. In this case, there was.

*Judgment affirmed. All the Justices concur, except Peterson, J., not participating.*

DECIDED JUNE 29, 2020 — RECONSIDERATION DENIED JULY 15, 2020.
Bonds. Fulton Superior Court. Before Judge McBurney.
*Carranza M. Pryor; John F. Woodham*, for appellants.
*Paul L. Howard, Jr., District Attorney; Christopher M. Carr, Attorney General, Ross W. Bergethon, Deputy Solicitor-General; Hunton & Williams, Douglass P. Selby, Matthew J. Calvert, Laura T. Wagner; Alvin L. Kendall; Holland & Knight, Robert S. Highsmith, Jr., Keith M. Wiener, A. André Hendrick, Grant E. L. Schnell, Patrick B. Reagin*, for appellees.